UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE INDEMNITY COMPANY,<br>ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,<br>AND ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,<br><br>    Plaintiffs,<br><br>vs.<br><br>SAYEEDUS S. SALEHIN, M.D.,<br>TODD L. LEBSON, D.C.,<br>ZHI-YUAN ZHONG, L.AC.,<br>CARMEN MARIA DONNA JOSE-DIZON, P.T.,<br>SHERWIN YONG TAMAYO, P.T.,<br>DEKUN WANG, L.AC.,<br>JACK BALDASSARE, M.D.,<br>AVENUE C MEDICAL, P.C.,<br>BROOKLYN MEDICAL PRACTICE, P.C.,<br>HARMONY CHIROPRACTIC, P.C.,<br>NORTH SHORE FAMILY CHIROPRACTIC, P.C.,<br>VISTA ACUPUNCTURE, P.C.,<br>TOTAL MOBILITY PT, P.C.,<br>WELLNESS EXPRESS PT, P.C.,<br>UNICORN ACUPUNCTURE, P.C.,<br>ECLIPSE MEDICAL IMAGING, P.C.,<br>ALBERT VAYNSHTEYN,<br>YELENA MAKSUMOV (a.k.a. "YELENA VAYNSHTEYN"),<br>ROBERT MAKS (a.k.a. "ROBERT MAKSUMOV"), and<br>CARDENAL MANAGEMENT CORP.,<br><br>    Defendants. | Civil Action No._____ |

## PLAINTIFFS' COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company, (collectively, "Allstate" and/or "Plaintiffs") by their attorneys, Smith & Brink, P.C., allege as follows:

## I.      **INTRODUCTION**

1.      This case is about laypersons and healthcare providers who banded together to access and then exploit the generous benefits available to automobile accident victims under New York's "No-Fault" insurance laws.

2.      The defendants' scheme was designed to achieve several goals, including (a) allowing laypersons to participate in the ownership, operation, and control of two multi-disciplinary healthcare facilities, (b) providing—and then collecting payment for—a substantial volume of medically unnecessary healthcare tests and services, and (c) channeling to the laypersons the professional fees and profits generated through the operation of the facilities.

3.      As detailed herein, Defendants Albert Vaynshteyn ("Vaynshteyn") and his wife, Yelena Maksumov ("Maksumov") (a.k.a. "Yelena Vaynshteyn"), owned and operated Cardenal Management Corp. ("Cardenal Management").

4.      Through Cardenal Management, Vaynshteyn and Maksumov operated and controlled a so-called "multi-disciplinary" facility that was located at 573 McDonald Avenue, Brooklyn, New York (the "McDonald Avenue Clinic"), as well as a successor facility that was located at 410 Ditmas Avenue, Brooklyn, New York (the "Ditmas Avenue Clinic").

5.      Vaynshteyn and Maksumov also participated in the unlawful operation and control of a diagnostic imaging center located at 651 Coney Island Avenue, Brooklyn, New York (the "Coney Island Avenue Clinic").

6.      Vaynshteyn and Maksumov, as laypersons, are prohibited by New York law from (a) providing professional healthcare services, (b) holding any ownership or controlling interests in any entity organized to provide professional healthcare services, or (c) sharing in the fees or profits generated through the delivery of professional healthcare services.

7. At all relevant times, Vaynshteyn and Maksumov used Cardenal Management to control the McDonald Avenue Clinic, the Ditmas Avenue Clinic, and the Coney Island Avenue Clinic, and profit from the services provided to patients at both clinics.

8. As set out below, Vaynshteyn and Maksumov, through Cardenal Management, purposely and knowingly conspired with Defendants Sayeedus Salehin, M.D. ("Salehin"), Todd L. Lebson, D.C. ("Lebson"), Zhi-Yuan Zhong, L.Ac. ("Zhong"), Carmen Maria Donna Jose-Dizon, P.T. ("Jose-Dizon"), Sherwin Yong Tamayo, P.T. ("Tamayo"), Dekun Wang, L.Ac. ("Wang"), and Jack Baldassare, M.D. ("Baldassare") (collectively, "Healthcare Provider Defendants") to carry out this scheme.

9. The Healthcare Provider Defendants provided services to patients of the McDonald Avenue Clinic, the Ditmas Avenue Clinic, and the Coney Island Avenue Clinic through the following entities: Avenue C Medical, P.C. ("Avenue C Medical"); Harmony Chiropractic, P.C. ("Harmony Chiropractic"); Vista Acupuncture, P.C. ("Vista Acupuncture"); Total Mobility PT, P.C. ("Total Mobility PT"); Brooklyn Medical Practice, P.C. ("Brooklyn Medical"); North Shore Family Chiropractic, P.C. ("North Shore Family Chiropractic"); Wellness Express PT, P.C. ("Wellness Express PT"); Unicorn Acupuncture, P.C. ("Unicorn Acupuncture"); and Eclipse Medical Imaging, P.C. ("Eclipse Medical Imaging") (collectively, "PC Defendants").

10. The PC Defendants were registered in the names of the Healthcare Provider Defendants, but the entities were always under the control of Vaynshteyn and Maksumov, and their associates.

11. Vaynshteyn and Maksumov exerted control in several ways, including using agreements between themselves and the PC Defendants, which were commercially unreasonable, and designed to adhere the PC Defendants to Vaynshteyn and Maksumov.

12.     The agreements were also structured to ensure that the PC Defendants' professional fees and profits were channeled to Vaynshteyn and Maksumov, through Cardenal Management.

13.     Vaynshteyn and Maksumov cemented their control over this scheme and the PC Defendants by installing Maksumov's brother, Defendant Robert Maks ("Maks") (a.k.a. "Robert Maksumov"), as the boss of the McDonald Avenue Clinic, which gave Maks the authority to control the day-to-day operations of the McDonald Avenue Clinic and the PC Defendants that were operated from there (i.e., Avenue C, Vista Acupuncture, Harmony Chiropractic and Total Mobility PT).

14.     As set out below, Maks also participated in this scheme by owning and operating the Coney Island Avenue Clinic, and by controlling the operation and management of Eclipse Medical Imaging.

15.     Overall, the PC Defendants were vital to this scheme because the entities could be used to deliver healthcare services to patients, which could then be billed to insurers like Allstate.

16.     The State of New York was the perfect venue for the Defendants' fraud scheme because New York's No-Fault laws provides medical coverage totaling $50,000.00 for each person involved in a motor vehicle accident regardless of fault.

17.     For this scheme to pay-off, Vaynshteyn and Maksumov needed the PC Defendants to generate as much revenue as possible.

18.     As set out below, this goal was achieved by delivering medically unnecessary services to patients of the McDonald Avenue and Ditmas Avenue Clinics, and then causing the PC Defendants to seek and collect payment for those services.

19.     Another aspect of this scheme involved the referral of Ditmas Avenue Clinic patients to other providers controlled, by Vaynshteyn, Maksumov, Maks, and Cardenal Management.

20.     For example, several patients of the Ditmas Avenue Clinic were steered to Eclipse Medical Imaging for diagnostic imaging studies.

21.     The services provided by Eclipse Medical Imaging were not compensable because the diagnostic imaging studies purportedly performed upon the patients were not medically necessary and were provided for the purpose of creating false reasons to continue providing care through the PC Defendants.

22.     The services provided and billed for by Eclipse Medical Imaging were also not compensable under New York's No-Fault laws because Eclipse Medical Imaging was unlawfully owned by controlled by laypersons (i.e., Vaynshteyn, Maksumov, Maks, and/or Cardenal Management).

23.     Additionally, the regular referrals of Ditmas Avenue Clinic patients to Eclipse Medical Imaging were unlawful to the extent that Vaynshteyn, Maksumov, Maks, and/or Cardenal Management maintained controlling or ownership interests over Brooklyn Medical and Salehin (i.e., the source of the referral for diagnostic imaging studies) and Eclipse Medical Imaging (the provider of the diagnostic imaging services).

24.     As detailed with particularity herein, the defendants do not have—nor have they ever had—any right to seek or collect No-Fault benefit payments from Allstate in connection with tests and services purportedly provided to patients of the McDonald Avenue Clinic, Ditmas Avenue Clinic, and Coney Island Avenue Clinic because: (a) the PC Defendants were unlawfully controlled by laypersons; (b) the tests and services were excessive, not clinically necessary, and

rendered according to a pre-determined protocol of treatment; (c) the PC Defendants' patient records and bills misrepresented material facts about the identity and employment status of the persons who actually provided the tests and services; (d) the bills submitted to Allstate by (or on behalf of) the PC Defendants materially misrepresented the nature and extent of the tests and services that were actually provided to patients; and (e) certain tests and services were furnished to patients according to unlawful arrangements between the providers to the extent that the treating provider (i.e., Eclipse Medical Imaging) and the source of the referral (i.e., Salehin and Brooklyn Medical) were under the common ownership and control of Vaynshteyn, Maksumov, Maks, and/or Cardenal Management.

25.     At all relevant times, the defendants have purposely induced Allstate to make No-Fault benefit payments to the PC Defendants in connection with tests and services that were purportedly provided to patients of the McDonald Avenue, Ditmas Avenue, and Coney Island Avenue Clinics, even though the defendants knew that the charges for these tests and services were not compensable under New York law.

26.     At all relevant times, each defendant knowingly and purposely conspired with one or more of their co-defendants to accomplish or further the unlawful objectives of this scheme.

27.     The success of the defendants' scheme to defraud Allstate depended upon the regular use of the U.S. Mail.

28.     As set out below, the defendants conducted the affairs of the PC Defendant enterprises by, among other things, using the U.S. Mail to transmit to Allstate the PC Defendants' treatment records, invoices, bills, and other insurance claim documents, all of which contained material misrepresentations concerning (a) the medical necessity of the tests and services

purportedly provided to patients, and (b) the PC Defendants' eligibility to collect No-Fault benefits under New York law.

29.     Allstate reasonably relied on the facial validity of the defendants' documents—and the representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

30.     By this Complaint, Allstate brings this action against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; and (c) unjust enrichment.

31.     This action seeks actual damages in excess of $3,076,251.63 representing "No-Fault" insurance payments that were wrongfully obtained from Allstate by (or on behalf of) the PC Defendants as a direct result of the defendants' unlawful conduct and material misrepresentations.

32.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay or reimburse the PC Defendants (or their agents) in connection with any past, present, or future claims submitted to Allstate seeking payment under New York's No-Fault laws because, at all relevant times: (a) the PC Defendants were unlawfully controlled by laypersons; (b) the tests and services were excessive, not clinically necessary, and rendered according to a pre-determined protocol of treatment; (c) the PC Defendants' patient records and bills misrepresented material facts about the identity and employment status of the persons who actually provided the tests and services; (d) the bills submitted to Allstate by (or on behalf of) the PC Defendants materially misrepresented the nature and extent of the tests and services that were actually provided to patients; and (e) certain tests and services were furnished to patients according to unlawful arrangements between the providers to the extent that the treating provider (i.e., Eclipse Medical

Imaging) and the source of the referral (i.e., Salehin and Brooklyn Medical) were under the common ownership and control of Vaynshteyn, Maksumov, Maks, and/or Cardenal Management.

33.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

34.     The defendants' scheme was designed to extract payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the defendants.

35.     In each patient claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the defendants sought—and in many cases obtained—payment for healthcare tests and services that were not compensable under New York's No-Fault laws.

36.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

37.     Allstate estimates that the defendants purposely submitted to Allstate thousands of bills on behalf of the PC Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II.     **THE PARTIES**

### A.     **PLAINTIFFS**

38.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

39.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

40.     At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company were each authorized to conduct business in New York.

B.     **DEFENDANTS**

1.     **Sayeedus Salehin, M.D.**

41.     Salehin resides in and is a citizen of the State of New York.

42.     Salehin is licensed to practice medicine in the State of New York.

43.     Salehin participated in this scheme by providing physician tests and services to patients of the McDonald Avenue Clinic through Avenue C Medical and to patients of the Ditmas Avenue Clinic through Brooklyn Medical.

44.     Salehin also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Avenue C Medical and Brooklyn Medical, and by allowing Vaynshteyn and Maksumov to control Avenue C Medical and Brooklyn Medical and profit from their operation.

45.     Even though he did not fully control Avenue C Medical and Brooklyn Medical, Salehin still participated in the operation of the Avenue C Medical and Brooklyn Medical enterprises by signing—or lending his name to—Avenue C Medical's and Brooklyn Medical's corporate and ownership documents, as well as the entities' treatment records and invoices; therefore, Salehin is responsible for the fraudulent and non-compensable services that were

rendered to patients of Avenue C Medical and Brooklyn Medical and billed to Allstate under New York's No-Fault laws.

### 2. Todd L. Lebson, D.C.

46. Lebson resides in and is a citizen of the State of New York.

47. Lebson is licensed to practice chiropractic treatment in the State of New York.

48. Lebson participated in this scheme by providing chiropractic services to the patients of the McDonald Avenue Clinic through Harmony Chiropractic and the Ditmas Avenue Clinic through North Shore Family Chiropractic.

49. Lebson also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Harmony Chiropractic and North Shore Family Chiropractic, and by allowing laypersons to control and profit from their operation.

50. Even though he did not fully control Harmony Chiropractic and North Shore Family Chiropractic, Lebson still participated in the operation of the Harmony Chiropractic and North Shore Family Chiropractic enterprises by signing—or lending his name to—Harmony Chiropractic's and North Shore Family Chiropractic's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Lebson is responsible for the fraudulent and non-compensable services that were rendered to patients of Harmony Chiropractic and North Shore Family Chiropractic and billed to Allstate under New York's No-Fault laws.

### 3. Zhi-Yuan Zhong, L.Ac.

51. Zhong resides in and is a citizen of the State of New York.

52. Zhong is licensed to practice acupuncture in the State of New York.

53. Zhong participated in this scheme by providing acupuncture services to patients of the McDonald Avenue Clinic and the Ditmas Avenue Clinic through Vista Acupuncture.

54.     Zhong also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Vista Acupuncture, and by allowing laypersons to control and profit from the operation of Vista Acupuncture.

55.     Even though he did not fully control Vista Acupuncture, Zhong still participated in the operation of the Vista Acupuncture enterprise by signing—or lending his name to—Vista Acupuncture's corporate and ownership documents, and to the entity's treatment records and invoices; therefore, Zhong is responsible for the fraudulent and non-compensable services that were rendered to patients of Vista Acupuncture and billed to Allstate under New York's No-Fault laws.

### 4.     Carmen Maria Donna Jose-Dizon, P.T.

56.     Jose-Dizon resides in and is a citizen of the State of New York.

57.     Jose-Dizon is licensed to practice physical therapy in the State of New York.

58.     Jose-Dizon participated in this scheme by providing physical therapy services to patients of the McDonald Avenue Clinic through Total Mobility PT.

59.     Jose-Dizon also participated in this scheme by falsely holding herself out to the public and to Allstate as the sole officer, director, and shareholder of Total Mobility PT, and by allowing laypersons to control and profit from the operation of Total Mobility PT.

60.     Even though she did not fully control Total Mobility PT, Jose-Dizon still participated in the operation of the Total Mobility PT enterprise by signing—or lending her name to—Total Mobility PT's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Jose-Dixon is responsible for the fraudulent and non-compensable services that were rendered to patients of Total Mobility PT and billed to Allstate under New York's No-Fault laws.

### 5.     Sherwin Yong Tamayo, P.T.

61.     Tamayo resides in and is a citizen of the State of New York.

62.     Tamayo is licensed to practice physical therapy in the State of New York.

63.     Tamayo participated in this scheme by providing physical therapy services to patients of the Ditmas Avenue Clinic through Wellness Express PT.

64.     Tamayo also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Wellness Express PT, and by allowing laypersons to control and profit from the operation of Wellness Express PT.

65.     Even though he did not fully control Wellness Express PT, Tamayo still participated in the operation of the Wellness Express PT enterprise by signing—or lending his name to—Wellness Express PT's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Tamayo is responsible for the fraudulent and non-compensable services that were rendered to patients of Wellness Express PT and billed to Allstate under New York's No-Fault laws.

### 6.     Dekun Wang, L.Ac.

66.     Wang resides in and is a citizen of the State of New York.

67.     Wang is licensed to practice acupuncture in the State of New York.

68.     Wang participated in this scheme by providing acupuncture services to patients of the McDonald Avenue Clinic as an employee of Vista Acupuncture, and to patients of the Ditmas Avenue Clinic through Unicorn Acupuncture.

69.     Wang also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Unicorn Acupuncture, and by allowing laypersons to control and profit from the operation of Unicorn Acupuncture.

70.     Wang participated in the operation of the Vista Acupuncture enterprise by signing—or lending his name to—Vista Acupuncture's treatment records and invoices; therefore, Wang is responsible for the fraudulent and non-compensable services that he rendered to patients of Vista Acupuncture, which were then billed to Allstate under New York's No-Fault laws.

71.     Additionally, even though he did not fully control Unicorn Acupuncture, Wang still participated in the operation of the Unicorn Acupuncture enterprise by signing—or lending his name to—Unicorn Acupuncture's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Wang is responsible for the fraudulent and non-compensable services that were rendered to patients of Unicorn Acupuncture and billed to Allstate under New York's No-Fault laws.

### 7.      Jack Baldassare, M.D.

72.     Baldassare resides in and is a citizen of the State of New Jersey.

73.     Baldassare is licensed to practice medicine in the State of New York.

74.     Baldassare participated in this scheme by providing diagnostic imaging services to the patients of the Ditmas Avenue Clinic through Eclipse Medical Imaging, which was operated from the Coney Island Avenue Clinic.

75.     Baldassare also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and shareholder of Eclipse Medical Imaging, and by allowing laypersons to control and profit from the operation of Eclipse Medical Imaging.

76.     Even though he did not fully control Eclipse Medical Imaging, Baldassare still participated in the operation of the Eclipse Medical Imaging enterprise by signing—or lending his name to— Eclipse Medical Imaging's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Baldassare is responsible for the fraudulent and non-

compensable services that were rendered to patients of Eclipse Medical Imaging and billed to Allstate under New York's No-Fault laws.

### 8.     Avenue C Medical, P.C.

77.     Avenue C Medical is organized as a physician-owned professional corporation under New York law with a principal place of business located at 573 McDonald Avenue, Brooklyn, New York.

78.     At all relevant times, Salehin falsely purported to be the sole officer, director, and shareholder of Avenue C Medical.

79.     As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the Avenue C Medical enterprise by exerting unlawful control over Salehin and Avenue C Medical, including Avenue C Medical's professional fees and profits.

80.     As part of this scheme, Avenue C Medical was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Avenue C Medical was unlawfully operated and controlled by laypersons.

81.     Because Avenue C Medical was unlawfully operated and controlled by laypersons, Avenue C Medical was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 9.     Harmony Chiropractic, P.C.

82.     Harmony Chiropractic is organized as a chiropractor-owned professional corporation under New York law with a principal place of business located at 573 McDonald Avenue, Brooklyn, New York.

83. At all relevant times, Lebson has falsely purported to be the sole officer, director, and shareholder of Harmony Chiropractic.

84. As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the Harmony Chiropractic enterprise by exerting unlawful control over Lebson and Harmony Chiropractic, including Harmony Chiropractic's professional fees and profits.

85. As part of this scheme, Harmony Chiropractic was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Harmony Chiropractic was unlawfully operated and controlled by laypersons.

86. Because Harmony Chiropractic was unlawfully operated and controlled by laypersons, Harmony Chiropractic was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 10. **Vista Acupuncture, P.C.**

87. Vista Acupuncture is organized as an acupuncturist-owned professional corporation under New York law with a principal place of business located at 573 McDonald Avenue, Brooklyn, New York.

88. At all relevant times, Zhong falsely purported to be the sole officer, director, and shareholder of Vista Acupuncture.

89. As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the Vista Acupuncture enterprise by exerting unlawful control over Zhong and Vista Acupuncture, including Vista Acupuncture's professional fees and profits.

90.     As part of this scheme, Vista Acupuncture was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Vista Acupuncture was unlawfully operated and controlled by laypersons.

91.     Because Vista Acupuncture was unlawfully operated and controlled by laypersons, Vista Acupuncture was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 11.     Total Mobility PT, P.C.

92.     Total Mobility PT is organized as a physical therapist-owned professional corporation under New York law with a principal place of business located at 573 McDonald Avenue, Brooklyn, New York.

93.     At all relevant time, Jose-Dizon has falsely purported to be the sole officer, director, and shareholder of Total Mobility PT.

94.     As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the Total Mobility PT enterprise by exerting unlawful control over Jose-Dizon and Total Mobility PT, including Total Mobility PT's professional fees and profits.

95.     As part of this scheme, Total Mobility PT was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Total Mobility PT was unlawfully operated and controlled by laypersons.

96.     Because Total Mobility PT was unlawfully operated and controlled by laypersons, Total Mobility PT was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was

therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 12.   Brooklyn Medical Practice, P.C.

97.     Brooklyn Medical is organized as a physician-owned professional corporation under New York law with a principal place of business located at 410 Ditmas Avenue, Brooklyn, New York.

98.     At all relevant times, Salehin has falsely purported to be the sole officer, director, and shareholder of Brooklyn Medical.

99.     As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the Brooklyn Medical enterprise by exerting unlawful control over Salehin and Brooklyn Medical, including Brooklyn Medical's professional fees and profits.

100.    As part of this scheme, Brooklyn Medical was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Brooklyn Medical was unlawfully operated and controlled by laypersons.

101.    Because Brooklyn Medical was unlawfully operated and controlled by laypersons, Brooklyn Medical was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 13.   North Shore Family Chiropractic, P.C.

102.    North Shore Family Chiropractic is organized as a chiropractor-owned professional corporation under New York law with a principal place of business located at 410 Ditmas Avenue, Brooklyn, New York.

103.    At all relevant times, Lebson has falsely purported to be the sole officer, director, and shareholder of North Shore Family Chiropractic.

104.    As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the North Shore Family Chiropractic enterprise by exerting unlawful control over Lebson and North Shore Family Chiropractic, including North Shore Family Chiropractic's professional fees and profits.

105.    As part of this scheme, North Shore Family Chiropractic was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though North Shore Family Chiropractic was unlawfully operated and controlled by laypersons.

106.    Because North Shore Family Chiropractic was unlawfully operated and controlled by laypersons, North Shore Family Chiropractic was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 14.    Wellness Express PT, P.C.

107.    Wellness Express PT is organized as a physical therapist-owned professional corporation under New York law with a principal place of business located at 410 Ditmas Avenue, Brooklyn, New York.

108.    At all relevant times, Tamayo has falsely purported to be the sole officer, director, and shareholder of Wellness Express PT.

109.    As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the Wellness Express PT enterprise by exerting unlawful control over Tamayo and Wellness Express PT, including Wellness Express PT's professional fees and profits.

110.    As part of this scheme, Wellness Express PT was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Wellness Express PT was unlawfully operated and controlled by laypersons.

111.    Because Wellness Express PT was unlawfully operated and controlled by laypersons, Wellness Express PT was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 15.    Unicorn Acupuncture, P.C.

112.    Unicorn Acupuncture is organized as an acupuncturist-owned professional corporation under New York law with a principal place of business located at 410 Ditmas Avenue, Brooklyn, New York.

113.    At all relevant times, Wang has falsely purported to be the sole officer, director, and shareholder of Unicorn Acupuncture.

114.    As set out below, Vaynshteyn and Maksumov, by and through Cardenal Management, participated in the operation and management of the Unicorn Acupuncture enterprise by exerting unlawful control over Wang and Unicorn Acupuncture, including Unicorn Acupuncture's professional fees and profits.

115.    As part of this scheme, Unicorn Acupuncture was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Unicorn Acupuncture was unlawfully operated and controlled by laypersons.

116.    Because Unicorn Acupuncture was unlawfully operated and controlled by laypersons, Unicorn Acupuncture was operated in direct violation of N.Y. Bus. Corp. Law § 1508,

and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 16.   Eclipse Medical Imaging, P.C.

117.   Eclipse Medical Imaging is organized as a physician-owned professional corporation under New York law with a principal place of business located at 651 Coney Island Avenue, Brooklyn, New York.

118.   At all relevant times, Baldassare has falsely purported to be the sole officer, director, and shareholder of Eclipse Medical Imaging.

119.   As set out below, Vaynshteyn, Maksumov, Maks, and Cardenal Management participated in the operation and management of the Eclipse Medical Imaging enterprise by exerting unlawful control over Baldassare and Eclipse Medical Imaging, including Eclipse Medical Imaging's professional fees and profits.

120.   Eclipse Medical Imaging engaged in unlawful conduct by seeking and collecting payments for diagnostic imaging studies that were not medically necessary, and by aggressively seeking and collecting payments under New York's No-Faults even though Eclipse Medical Imaging was not entitled to No-Fault reimbursement because it was unlawfully operated and controlled by laypersons.

121.   Because Eclipse Medical Imaging was unlawfully operated and controlled by laypersons, Eclipse Medical Imaging was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 17.   Albert Vaynshteyn

122.   Vaynshteyn resides in and is a citizen of New York.

123.    Vaynshteyn has never been licensed to provide professional healthcare services, in any form, in the State of New York.

124.    At all relevant times, Vaynshteyn, individually and through Cardenal Management, participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including the PC Defendants' professional fees and profits.

125.    As part of this scheme, Vaynshteyn caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

126.    Even if he did not personally deliver tests and services to patients, Vaynshteyn still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable tests and services, and (c) siphoning-off PC Defendants' professional fees and profits; therefore, Vaynshteyn is responsible for the fraudulent and non-compensable services that were rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault laws.

**18.    Yelena Maksumov (a.k.a. "Yelena Vaynshteyn")**

127.    Maksumov resides in and is a citizen of New York.

128.    Maksumov has never been licensed to provide professional health care services, in any form, in the State of New York.

129.    At all relevant times, Maksumov, individually and through Cardenal Management, participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including the PC Defendants' professional fees and profits.

130.     As part of this scheme, Maksumov caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

131.     Even if she did not personally deliver tests and services to patients, Maksumov still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable tests and services, and (c) siphoning-off PC Defendants' professional fees and profits; therefore, Maksumov is responsible for the fraudulent and non-compensable services that were rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault laws.

### 19.     Cardenal Management Corp.

132.     Cardenal Management is organized as a domestic business corporation under New York law with a principal place of business located at 38-08 14th Avenue, Brooklyn, New York.

133.     Cardenal Management is owned by Vaynshteyn and Maksumov.

134.     At all times relevant, Cardenal Management has controlled the properties located 573 McDonald Avenue, Brooklyn, New York and 410 Ditmas Avenue, Brooklyn, New York.

135.     Cardenal Management also owned and controlled the MRI magnet and subsystems installed at the Coney Island Avenue Clinic.

136.     During the relevant period, Vaynshteyn and Maksumov knowingly used Cardenal Management to unlawfully operate the PC Defendants and to unlawfully share in the professional physician fees and profits collected by the PC Defendants.

### 20.     Robert Maks (a.k.a. "Robert Maksumov")

137.     Maks resides in and is a citizen of New York.

138.    Maks has never been licensed to provide professional health care services, in any form, in the State of New York.

139.    Maks was installed as the manager of the McDonald Avenue Clinic during the relevant period, and therefore participated in the operation and management of the PC Defendants that operated from the McDonald Avenue Clinic.

140.    Maks also participated in the operation and management of the Eclipse Medical Imaging enterprise by owning and controlling the Coney Island Avenue Clinic, which served as Eclipse Medical Imaging's principal place of business during the relevant period.

141.    At all relevant times, Maks participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including the PC Defendants' professional fees and profits.

142.    As part of this scheme, Maks caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

143.    Even if he did not personally deliver tests and services to patients, Maks still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable tests and services, and (c) siphoning-off PC Defendants' professional fees and profits; therefore, Maks is responsible for the fraudulent and non-compensable services that were rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault laws.

## III.   JURISDICTION AND VENUE

144.   Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

145.   Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

146.   Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

147.   At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws (as detailed *infra*).

148.   The defendants' activities in and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

149.   As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent and non-compensable demands for payment under New York's No-Fault laws, a substantial relationship exists between the transactions at issue and Allstate's causes of action.

## IV.   NO-FAULT LAWS AND LICENSING STATUTES

### A.   NEW YORK'S NO-FAULT LAWS

150.   Allstate underwrites automobile insurance in the State of New York.

151.   New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

152.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.), and the regulations promulgated pursuant thereto (11 NYCRR § 65, et seq.) (collectively, "the No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault benefits") to Allstate claimants.

153.    Under the New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

154.    "Basic economic loss" is defined to include "all necessary expenses" for medical services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

155.    No-Fault benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

156.    A patient can assign his/her No-Fault benefits to healthcare providers.

157.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").

158.    Alternatively, healthcare providers may submit claims to insurance carriers using the Health Care Financing Administration Claim Form (known as the "HCFA-1500" form).

159.    NF-3 and HCFA-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

160.    Pursuant to § 403(d) of the New York State Insurance Law, NF-3s and HCFA-1500s must be verified by the healthcare provider subject to the following warning: "Any person

who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

161.   It is a material misrepresentation to submit NF-3 and HCFA-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

### B.   Unlawful Control of Professional Service Entities

162.   New York law requires that all professional healthcare service corporations be owned and controlled by appropriately licensed healthcare professionals.  *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

163.   Similarly, New York law prohibits anyone from engaging in the practice of medicine except those licensed to practice medicine.  *See* N.Y. Educ. Law §§ 6521-6522.

164.   Thus, in New York, only a licensed physician may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable to this case—economic benefit from physician services.

165.   Moreover, for a provider of healthcare services to be eligible to bill for and collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, professional service entities are not eligible to bill for services, or collect for those services from an insurer, where the services were

actually rendered by persons who are not employees of the professional service entity, such as independent contractors.

166. New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

167. New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

168. New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to an individual unless this individual is "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

169. Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

170. New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine.

171. Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

172.    Licensed physicians are also prohibited from delegating professional responsibilities to persons who lack qualification, training, experience, and/or licensure to perform them.

173.    Further, under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

174.    The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

175.    New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

176.    Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

177.    In New York, insurers may seek affirmative recovery against individuals and entities that have violated the above statutes and regulations.

178.    In *State Farm Mutual Automobile Insurance Company v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that

corporations organized and registered to provide professional health care services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional health care services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

179.    In the matter *Metroscan Imaging P.C. v. Government Employees Insurance Company*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), it was held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

180.    As detailed below, the defendants purposely and knowingly violated one or more of the above-cited New York statutes and regulations through the operation and management of Avenue C Medical, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, Harmony Chiropractic and Eclipse Medical Imaging.

### C.    NEW YORK WORKERS' COMPENSATION FEE SCHEDULE

181.    The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

182.    Both healthcare providers and automobile insurers consult the Fee Schedule to determine the level of reimbursement payable on legitimate claims.

183.    The purpose of the Fee Schedule is to: (a) provide comprehensive billing guidelines in order to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be

charged for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by health care service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

184.    Section 5102(a)(1) of the No-Fault Law defines "basic economic loss" as including "[a]ll necessary expenses incurred for…professional health services," "subject to the limitations of" Insurance Law § 5108.

185.    Insurance Law § 5108(b) provides that the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating" the provisions of the New York No-Fault Law and the Workers' Compensation Law "with respect to charges for the professional health services" specified in Insurance Law § 5102(a)(2), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

186.    Insurance Law § 5108(a) also provides that the "charges for services specified in" Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board."

D.    **BILLING PROHIBITED UNDER NEW YORK'S NO-FAULT LAWS FOR SERVICES PROVIDED BY INDEPENDENT CONTRACTORS**

187.    Under New York's No-Fault laws, an entity is only eligible for compensation if the billed-for services are provided by an owner or employee of the company.

188.    A provider's use of independent contractors, instead of employees, to provide healthcare services renders the provider ineligible to receive No-Fault reimbursement for those services from insurers like Allstate.  *See* DOI Opinion Letters, annexed hereto as Exhibit 1.

189.    During the course of this scheme, several of the PC Defendants—including, but not limited to, Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Brooklyn Medical,

North Shore Family Chiropractic, and Unicorn Acupuncture—have submitted bills to Allstate seeking payment for services that were actually provided by independent contractors.

## V.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

190.    New York's No-Fault system provides generous compensation for accident-related healthcare services, and also requires insurers to make prompt payment on patient claims.

191.    The system is designed to facilitate prompt payment of claims when a patient or provider submits facially-valid claim documents, such as invoices that identify the type of services provided, the name of the treating provider, the name of the entity billing for the services, and the name of each person who owns the entity.

192.    The system is vulnerable to fraud and abuse when providers submit claim documents containing material misrepresentations about the necessity of the billed-for services, the name and employment status of the treating provider, and the ownership status of the entity billing for the services.

193.    In general, providing truthful information in support of No-Fault claims is important because the system is designed to prevent delays and force insurers to make prompt payments.

194.    With respect to healthcare providers, providing truthful information about the services and the person or entity that provided the services is important because providers are not eligible to seek or collect payment under New York's No-Fault laws if they fail to meet any New York State or local licensing requirement necessary to perform such service in New York.

195.    As explained below, at all relevant times, the defendants have taken advantage of New York's No-Fault system by operating the PC Defendants in violation of one or more

applicable New York state licensing requirement governing the provision of professional physician services.

196.    The defendants, at all times relevant, knew that (a) the PC Defendants were actually controlled by non-physicians (i.e., Vaynshteyn, Maksumov, and Maks), and (b) the PC Defendants were caused to unlawfully split professional physician fees and profits with a non-physician.

197.    The control exerted by Vaynshteyn, Maksumov, and Maks—individually and through Cardenal Management—over the PC Defendants compromised patient care because Vaynshteyn's, Maksumov's, and Maks' financial interests were placed ahead of the patients' well-being.

198.    Vaynshteyn's, Maksumov's, and Maks' control over the operation and management of the McDonald Avenue, Ditmas Avenue, and Coney Island Avenue Clinics drove the PC Defendants to deliver and bill for tests and services that were not medically necessary.

199.    This wanton and indiscriminate delivery of treatment jeopardized the health and safety of patients because they were needlessly exposed to the risk of further injury or infection through tests and services they did not need, and because treatment decisions were not based on the individualized medical needs of the patients.

200.    The defendants, at all relevant times, knew that the PC Defendants were not eligible for compensation under New York's No-Fault laws, yet they routinely sought and collected payment from Allstate.

## A.   THE UNLAWFUL OPERATION AND CONTROL OF THE PC DEFENDANTS

### 1.   McDonald Avenue Clinic

201.   The McDonald Avenue Clinic was operated as a multidisciplinary clinic offering healthcare services from an array of providers, including a physician (i.e., Salehin), a chiropractor (i.e., Lebson), a physical therapist (i.e., Jose-Dizon), and acupuncturists (i.e., Zhong and Wang).

202.   Vaynshteyn and Maksumov established the McDonald Avenue Clinic to manage, control, and profit from the delivery of healthcare services to patients.

203.   Vaynshteyn and Maksumov took several steps to conceal their involvement in the operation, management, and control of the McDonald Avenue Clinic.

204.   First, acting through Cardenal Management, Vaynshteyn and Maksumov, upon information and belief, entered into an agreement to lease the facility located at 573 McDonald Avenue in Brooklyn, New York.

205.   Second, upon securing a location for their scheme, Vaynshteyn and Maksumov, through Cardenal Management, set up the clinic for operation by, among other things, procuring office equipment (e.g., copier systems, fax machines, printers, etc.), which would be leased to the PC Defendants as part of subleasing agreements that were arranged between Cardenal Management and the PC Defendants.

206.   Third, after establishing the location for their scheme, Vaynshteyn and Maksumov recruited Salehin, Lebson, Jose-Dizon, and Zhong to participate in the scheme.

207.   Fourth, once recruited into the scheme, Salehin, Lebson, Jose-Dizon, and Zhong organized the PC Defendants.

208.   Once the PC Defendants were organized, the PC Defendants, upon information and belief, entered into one or more agreements with Cardenal Management for use of the clinic's office space, equipment, and personnel.

209.    Upon information and belief, their agreements with Cardenal Management obligated the PC Defendants to make excessive monthly payments for the services provided in connection with the McDonald Avenue Clinic.

210.    The agreements between Cardenal Management and the PC Defendants were purposely structured to create the illusion that Vaynshteyn and Maksumov, through Cardenal Management, maintained legitimate, arm's-length business relationships with the PC Defendants and their nominal licensee-owners.

211.    The agreements were also purposely structured to give Vaynshteyn and Maksumov total control of the McDonald Avenue Clinic.

212.    Vaynshteyn and Maksumov provided the PC Defendants with the opportunity to join a turn-key practice, where Cardenal Management was responsible for all the duties and responsibilities typically associated with operating and managing a legitimate healthcare practice, such as securing clinical space, procuring office and medical equipment, hiring clinic staff and supportive personnel, and managing the day-to-day operations of the clinic.

213.    Vaynshteyn and Maksumov engaged in several deceptive acts that were meant to project an image of legitimacy surrounding the operation of the McDonald Avenue Clinic while, at the same time, cementing and concealing their control over the clinic and the PC Defendants.

214.    For example, Vaynshteyn and Maksumov, through Cardenal Management, installed exterior signage at the McDonald Avenue Clinic that read "Medical Plaza" rather than identifying the specific names of the PC Defendants or the licensed professionals that operated from the clinic.

215.    The use of generic signage allowed for the seamless transition from one provider to another if Vaynshteyn and Maksumov decided to change one or more of the PC Defendants.

216.   To cement their control over the McDonald Avenue Clinic, Vaynshteyn and Maksumov installed Maks—who was Maksumov's brother and Vaynshteyn's brother-in-law—as the clinic's office manager.

217.   Likewise, the Healthcare Provider Defendants and PC Defendants that operated from the McDonald Avenue Clinic were caused to share the same telephone number (i.e., (718) 972-4004)), which, upon information and belief, was registered to Cardenal Management.

218.   At all relevant times, one or more unlicensed layperson unlawfully managed and controlled the Ditmas Avenue Clinic and its associated healthcare providers, including the PC Defendants.

219.   The PC Defendants were also caused to unlawfully channel their professional fees and profits to one or more unlicensed layperson.

220.   As a result of this unlawful conduct, the PC Defendants operating at the Ditmas Avenue Clinic were never eligible to receive No-Fault reimbursement under New York law.

221.   The defendants operated the McDonald Avenue Clinic until late 2015, when they transferred this scheme to a new location.

### 2.   Ditmas Avenue Clinic

222.   Following the closure of the McDonald Avenue Clinic, the defendants migrated to a new location at 410 Ditmas Avenue where they resumed their scheme to defraud.

223.   The Ditmas Avenue Clinic was simply a continuation of the McDonald Avenue Clinic, but the names of the PC Defendants were changed as a means to conceal Vaynshteyn's and Maksumov's continuing unlawful control over the clinic and its associated healthcare providers.

224.   Salehin, Lebson, and Wang have all provided vague or misleading answers when asked to explain their migration from the McDonald Avenue Clinic.

225.    For example, Wang misrepresented material facts concerning his prior involvement in the McDonald Avenue Clinic and the circumstances surrounding his decision to organize Unicorn Acupuncture and associate with the Ditmas Avenue Clinic.

226.    Wang provided misleading testimony about his employment through Vista Acupuncture and his prior interactions with Salehin while working at the McDonald Avenue Clinic.

227.    The Ditmas Avenue Clinic was designed to provide a wide array of healthcare services, such as physician evaluations and consultations, and physical therapy and acupuncture services.

228.    Vaynshteyn and Maksumov purposely established the Ditmas Avenue Clinic so that they could continue managing, controlling, and profiting from the delivery of healthcare services to patients of the Ditmas Avenue Clinic.

229.    As with the McDonald Avenue Clinic, Vaynshteyn and Maksumov concealed their involvement in the operation, management, and control of the Ditmas Avenue Clinic.

230.    For example, instead of having Cardenal Management serve as the master leaseholder, Brooklyn Medical was nominated to hold the master ground lease for the Ditmas Avenue Clinic.

231.    The first step in organizing the Ditmas Avenue Clinic involved forming Brooklyn Medical as a new professional service entity, with Salehin listed as Brooklyn Medical's sole officer, director, and shareholder.

232.    Notably, Brooklyn Medical was organized in or around July 2014, which was approximately 18 months prior to the closing of the McDonald Avenue Clinic and the opening of the Ditmas Avenue Clinic.

233.    The early formation of Brooklyn Medical was necessary because the defendants needed a vehicle through which they could ready the Ditmas Avenue Clinic for operation.

234.    The Ditmas Avenue Clinic space required extensive renovation prior to opening.

235.    To facilitate the start of the Ditmas Avenue Clinic, Salehin, acting through Brooklyn Medical, allegedly entered into a master lease agreement with the landlord of the Ditmas Avenue Clinic.

236.    The renovations of the Ditmas Avenue Clinic space are shrouded in mystery.

237.    Salehin could not provide several material details about the project when asked to provide specific information about the nature and cost of the renovations.

238.    Salehin allegedly paid for the Ditmas Avenue Clinic renovations from his own personal funds, which reportedly cost him more than $600,000.00.

239.    However, other documents produced by the defendants have valued the renovations at $1,400,000.00 yet Salehin produced canceled checks for renovations and a security system totaling $184,000.00.

240.    Lebson, who transitioned his practice from the McDonald Avenue Clinic to the Ditmas Avenue Clinic at the same time as Salehin, was also unable to explain several material details about the renovation of the Ditmas Avenue Clinic space or the reason why he transferred his practice to the Ditmas Avenue Clinic.

241.    Notably, however, according to information on file with the New York City Department of Buildings, the building permits for the renovations were obtained by the landlord, and not Salehin or Brooklyn Medical.

242.    Once the renovation of the Ditmas Avenue Clinic space was complete, Lebson and Wang—acting through different entities than the ones they operated or worked for at the

McDonald Avenue Clinic—entered into subleasing agreements with Salehin and Brooklyn Medical.

243.    Lebson, now acting through North Shore, entered into a sublease agreement with Salehin and Brooklyn Medical that required North Shore to pay Brooklyn Medical approximately $14,000.00 per month to operate at the Ditmas Avenue Clinic; however, the master lease agreement (for the entire building) requires rental payments ranging from $16,666.67 per month to $23,070.56 per month depending upon yearly rent escalation.

244.    Likewise, Wang, acting through Unicorn Acupuncture, entered into a sublease agreement with Salehin and Brooklyn Medical that required Unicorn Acupuncture to pay Brooklyn Medical approximately $15,000.00 per month to operate at the Ditmas Avenue Clinic.

245.    The Brooklyn Medical-North Shore and Brooklyn Medical-Unicorn Acupuncture sublease agreements were not commercially reasonable and purposely structured to funnel monies to Brooklyn Medical.

246.    Salehin, Lebson, and Wang have each misrepresented material facts about the fair market value and the commercial reasonableness of the Brooklyn Medical-North Shore and Brooklyn Medical-Unicorn Acupuncture sublease agreements.

247.    While the valuation opinion was purportedly obtained by Brooklyn Medical for the purpose of evaluating the subleases that Brooklyn Medical held with other providers, Salehin— the supposed sole owner of Brooklyn Medical—played no role in obtaining the opinion.

248.    For example, Lebson made all the arrangements for the valuation opinion, and Salehin never actually spoke to the firm that conducted the fair market evaluation.

249.    The opinion itself is misleading because it purports to set the fair market leasing value at the precise amounts charged to North Shore and Unicorn Acupuncture even though the

evaluators did not actually analyze the master leasing agreement (i.e., the lease agreement between Brooklyn Medical and the landlord), copies of any other subleases concerning the Ditmas Avenue Clinic space, or any of the parties' financial records or statements.

250.     The arrangement between Brooklyn Medical and Unicorn Acupuncture demonstrates the illusory nature of the purported fair market, arms-length relationship that existed between them.

251.     According to the fair market value opinion letter, the Ditmas Avenue Clinic space underwent an extensive renovation in 2015, which involved gutting the building to its structural beams, and installing new electric, plumbing, and HVAC systems, along with a new elevator, windows, and exterior façade.

252.     According to the fair market value opinion letter, the renovations were completed at a total cost of $1,400,000.00.

253.     Following the completion of the renovation, however, Unicorn Acupuncture continued to make substantial payments for "leasehold improvements" in connection with the Brooklyn Medical-Unicorn Acupuncture sublease.

254.     For example, during 2017 and 2018, Unicorn Acupuncture allegedly incurred leasehold improvement-related expenses totaling over $308,000.00.

255.     Unicorn Acupuncture's leasehold improvement payments are irregular and likely fraudulent because it is highly improbable that a sublessee would spend over $300,000.00 making improvements to a property that was completely renovated just 2 years earlier.

256.     Moreover, the Brooklyn Medical-Unicorn Acupuncture sublease does not contain any provisions concerning the tenant improvements so there is simply no valid or commercially-reasonable explanation why Wang and Unicorn Acupuncture would be making these payments in

addition to the substantial leasing payments that Unicorn Acupuncture was already making to Brooklyn Medical.

257.    The arrangement that allowed Wang to operate Unicorn Acupuncture at the Ditmas Avenue Clinic was purposely structured to make Wang and Unicorn Acupuncture completely beholden and financially obligated to Brooklyn Medical and others.

258.    For example, in 2018, Unicorn Acupuncture's gross annual revenue exceeded $1,000,000.00, yet Wang only received a salary of $75,000.00.

259.    Overall, over 90% of Unicorn Acupuncture's revenue went to persons other than Wang, who was allegedly the only officer, director, and shareholder of Unicorn Acupuncture.

260.    The revenue of Unicorn Acupuncture and the other PC Defendants was eventually channeled, upon information and belief, to Vaynshteyn and Maksumsov who continued to maintain a stake in the operation and management of the Ditmas Avenue Clinic through Cardenal Management.

261.    Indeed, Cardenal Management continued to associate with the Ditmas Avenue Clinic by maintaining interests in certain equipment installed at the clinic.

262.    Through these agreements and other means, the professional fees and profits of the PC Defendants were, upon information and belief, unlawfully channeled to Vaynshteyn and Maksumov.

263.    Like the McDonald Avenue Clinic, the Ditmas Avenue Clinic was designed to be under the control of Vaynshteyn and Maksumov.

264.    Also like the McDonald Avenue Clinic, the Ditmas Avenue Clinic offered the chance for Salehin, Lebson, and Wang to begin providing services under new corporate names and tax identification numbers using a clinic that was already set-up and ready for operation.

265. The PC Defendants were able to operate out of the Ditmas Avenue Clinic without being burdened with the costs or administrative duties involved in operating and managing a multi-disciplinary healthcare clinic, such as securing clinical office space, hiring, managing and paying clinic employees and support personnel, acquiring equipment and supplies, generating bills, and collecting payments from insurers.

266. Similar to the McDonald Avenue Clinic, the Ditmas Avenue Clinic was also adorned with vague exterior signage that simply read "Medical & Wellness Center" instead of identifying the name of any of the specific providers that operating from the facility.

267. This type of generic clinic signage was part of an arsenal of tricks used by Vaynshteyn and Maksumov to make the Ditmas Avenue Clinic look like a multi-disciplinary clinic, while allowing them to retain control over the clinic.

268. As with the McDonald Avenue Clinic, the vague branding of the Ditmas Avenue Clinic allowed Vaynshteyn and Maksumov to make a seamless transition from one provider to another if they need to substitute an existing company or provider with a new one.

269. Likewise, the website created by (or on behalf of) the defendants (i.e., www.medicalwellnessny.com), identifies the healthcare services available at the "Medical & Wellness Center" but specifically does not include the identity of the physicians and medical providers operating from this location.

270. Nothing on the defendants' website indicates that the "Medical & Wellness Center" is actually comprised of several different professional medical corporations, each of which is purportedly owned by a member of the staff/team.

271. Further, the Healthcare Provider Defendants and PC Defendants operating out of the Ditmas Avenue Clinic have been caused to share (a) the same telephone number (i.e., (718)

41

484-4878) and facsimile number (i.e., (718) 484-4874) which, upon information and belief, are registered to Cardenal Management, (b) the same operating hours, (c) the same administrative and/or professional front desk staff, and (d) the same common areas.

272.    At all relevant times, one or more unlicensed layperson unlawfully managed and controlled the Ditmas Avenue Clinic and its associated healthcare providers, including the PC Defendants.

273.    The PC Defendants were also caused to unlawfully channel their professional fees and profits to one or more unlicensed layperson.

274.    As a result of this unlawful conduct, the PC Defendants operating at the Ditmas Avenue Clinic were never eligible to receive No-Fault reimbursement under New York law.

### 3.    Coney Island Avenue Clinic and Eclipse Medical Imaging

275.    Eclipse Medical Imaging purportedly provided diagnostic imaging services, such as MRIs, during the relevant period.

276.    At all relevant times, Eclipse Medical Imaging was operated from the Coney Island Avenue Clinic, which was located in a building at 651 Coney Island Avenue in Brooklyn.

277.    The services provided by Eclipse Medical Imaging played a vital role in the defendants' scheme because positive MRI findings could be relied upon to support the provision of further (and unnecessary) tests and treatments.

278.    In most cases, patients of the Ditmas Avenue Clinic were subjected to an initial examination that was conducted by Salehin through Brooklyn Medical, typically within a few days of the alleged accident.

279.     Salehin regularly concluded these initial examinations by ordering or prescribing a battery of tests and services, including diagnostic imaging services, which usually involved the patients undergoing MRIs on several different parts of their body.

280.     Salehin's ordering of multiple MRIs at the initial visit was reckless and seemingly designed to capture as many treatment opportunities as possible before the patients terminated or became non-compliant with their treatment.

281.     Salehin's ordering of multiple MRIs was also designed to generate a substantial volume of patients that could be referred to Eclipse Medical Imaging for these services.

282.     Indeed, the majority of Eclipse Medical Imaging's patient base was comprised of Ditmas Avenue Clinic patients who were ordered to undergo multiple MRIs.

283.     This arrangement was beneficial to the defendants because Salehin's initial examinations generated numerous opportunities for testing and treatment, including MRIs that could be provided and billed for through Eclipse Medical Imaging.

284.     This arrangement was also beneficial because the MRI results generated by Eclipse Medical Imaging were relied upon by Salehin and others as a basis to deliver an even wider array of tests and services at the Ditmas Avenue Clinic, such as physical therapy, chiropractic, acupuncture, pain management evaluation and injections, and orthopedic evaluations and surgical procedures.

285.     Eclipse Medical Imaging's importance to this scheme is reflected by the fact that Maks owned both Eclipse Medical Imaging and the Coney Island Avenue Clinic, which allowed the defendants to control and share in the No-Fault payments collected by Eclipse Medical Imaging.

286.   New York law prohibits Maks, a layperson, from owning, controlling, or profiting from a professional service entity formed to provide physician services.

287.   Maks made several material representations concerning his ownership of Eclipse Medical Imaging and the Coney Island Avenue Clinic.

288.   For example, when seeking a permit to renovate the Coney Island Avenue Clinic, Maks represented in a NYC Department of Buildings permit application that he was the owner of the 651 Coney Island Avenue property, and the owner of Eclipse Medical Imaging.

289.   As a layperson, Maks was prohibited under New York law from owning or controlling Eclipse Medical Imaging.

290.   Eclipse Medical Imaging's importance to this scheme is also reflected by the fact that Cardenal Management owned the MRI magnet and subsystems that were installed at the Coney Island Avenue Clinic.

291.   Overall, the operation and management of Eclipse Medical Imaging was dominated by laypersons whereas Maks owned Eclipse Medical Imaging and its principal place of business (i.e., the Coney Island Avenue Clinic), and because Vaynshteyn and Maksumov, through Cardenal Management) owned and controlled the equipment that Eclipse Medical Imaging was obligated to utilize (and pay rent for) when conducting diagnostic imaging studies, including the MRIs administered to Ditmas Avenue Clinic patients.

292.   Accordingly, Eclipse Medical Imaging was never eligible to seek or collect payment under New York's No-Fault laws.

## B. FRAUDULENT TREATMENT PROTOCOL

293.    The McDonald Avenue Clinic and Ditmas Avenue Clinic were specifically designed to deliver as many tests and services as possible without any regard for the individual needs of the patients.

294.    In this case, patients typically presented with soft tissue sprains and strains with degenerative-type changes reflected on the patients' MRI scans, generally meaning that the injuries were minor and likely not related to the alleged accident.

295.    Salehin was the entry point for treatment, as patients were initially evaluated by him through Avenue C or Brooklyn Medical, and then set on a course of treatment that called for an array of medical services by providers under Vaynshteyn and Maksumov's control.

296.    According to Salehin, patients of the Clinics "use all the sources available. When they come for physical therapy, they can have acupuncture… when patient come in, they can get whatever."

297.    The patients of the Clinics, however, have indicated that the array of medical services were not optional.

298.    According to claimant J.G. (Claim No. 0492695548), Salehin instructed that physical therapy, chiropractic, acupuncture, cupping sessions, and aqua-med hydrotherapy services were required during every session.

299.    Likewise, claimant I.R.H. (Claim No. 0538421405) was prescribed a course of physical therapy, acupuncture, and chiropractic treatment by Salehin at the conclusion of the first visit, and was informed that all of these treatments would be provided at the same facility (i.e., the Ditmas Avenue Clinic).

300.    Claimant I.H. (Claim No. 0530756360) denied having any choice concerning the course of treatment; instead, Salehin ordered a regimen of physical therapy, chiropractic, acupuncture and cupping treatment on the first visit, which was then administered during every subsequent session.

301.    Moreover, claimant M.A. (Claim No. 0485383400) was ordered by Salehin to undergo a course of physical therapy, acupuncture, aqua-med hydrotherapy, cupping, and chiropractic treatment three-to-four times every week.  According to M.A., this course of treatment persisted—unchanged—for approximately seven months.

302.    Indeed, nearly every patient was ordered to undergo physical therapy, chiropractic, and acupuncture at the Clinics.

303.    Patients were routinely given these orders even though soft-tissue sprains and strains are self-limiting and will typically respond to conservative care in less than three (3) months.

304.    Such conservative care measures may include anti-inflammatory medications, physical therapy, or chiropractic care.

305.    It is often reasonable for patients with such soft-tissue injuries to receive *either* physical therapy *or* chiropractic care—but not both—for a brief interval of time following the motor vehicle accident with a rapid transition to a home exercise program.

306.    At the McDonald Avenue Clinic, patients were referred for concurrent chiropractic treatment with Lebson through Harmony Chiropractic, physical therapy treatment with Jose-Dizon through Total Mobility PT, and acupuncture treatment with Zhong through Vista Acupuncture.

307.    Likewise, at the Ditmas Avenue Clinic, patients were referred for chiropractic treatment with Lebson through North Shore Family Chiropractic, physical therapy treatment with

Tamayo through Wellness Express PT, and acupuncture treatment with Wang or Zhong through Unicorn Acupuncture.

308.    The patients were also referred to several other providers for other tests and services.

309.    In many cases, patients were given prescriptions for MRIs and medications, and then steered to other providers under the defendants' control (i.e., Eclipse Medical Imaging and others) to fulfill these prescriptions.

310.    In some cases, patients were referred to other physicians for pain management and orthopedic evaluations.

311.    The defendants purposely steered patients to these providers because the providers were owned by (or maintained close relationships with) Vaynshteyn and Maksumov.

312.    The referrals for pain management and orthopedic evaluations depended on availability as the defendants maintained arrangements with transient physicians who came to the Clinics on a periodic basis to see patients.

313.    In the case of orthopedic evaluations at the Ditmas Avenue Clinic, patients were often ordered to undergo an evaluation, and then escorted to a downstairs area of the clinic where the orthopedist was allowed to see patients.

314.    In the case of MRIs, patients were referred to Eclipse Medical Imaging, which was under the ownership and control of Vaynshteyn, Maksumov, Maks, and Cardenal Management.

315.    Aside from being financially motived, the referral of patients to all these different providers served mainly the interests of Vaynshteyn and Maksumov because the results of these tests and evaluations always provided a basis—albeit false—to continue patient care.

316.    Patients continued care as long as insurance coverage was available.

317.     In most cases, patients received over 100 separate treatments at the Clinics, while some patients were subjected to upwards of 600-700 separate treatments during their course of care.

318.     In at least one case, an Allstate claimant was subjected to over 900 separate treatments at the Clinics.

319.     Overall, the defendants created a system where patients were indiscriminately subjected to a regimen of tests and services that were (a) medically unnecessary, (b) fraudulently reported, (c) falsely billed, (d) part of a pre-determined protocol of treatment, and (e) provided for the sole purpose of maximizing the profits of the provider rather than improving the condition of the patient.

320.     Because the tests and services provided to patients of the Clinics were (a) not medically necessary, (b) fraudulently reported, and (c) falsely charged, the No-Fault benefit claims submitted by PC Defendants for these tests and services are not compensable.

321.     To the extent that Allstate paid the PC Defendants in reliance on the documents created and submitted to Allstate in connection with any tests and services provided to patients of the Clinics, including, but not limited to, those payments listed in Exhibits 10-17, Allstate is entitled to recover all payments made to the PC Defendants in connection with any such services.

322.     Additionally, to the extent that any of the PC Defendants' charges submitted in connection with these tests and services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because those tests and services were excessive, not warranted, and therefore not compensable under New York's No-Fault Law.

323. The following examples serve to demonstrate, with particularity, how the defendants exploited their patients and defrauded Allstate by providing and then billing for tests and serviced that were false, fraudulent, and not compensable under New York's No-Fault laws.

### 1. Patient O.C. (Claim No. 0413937608)

324. Patient O.C. (Claim No. 0413937608) presented at Brooklyn Medical on May 25, 2016 for an initial examination with Salehin, who noted that O.C. purportedly had complaints consisting of neck, mid and lower back, right shoulder, left ankle and bilateral knee pain.

325. In his initial examination report, Salehin noted that O.C. was in "severe distress," and further speculated that O.C.'s condition might become permanent.

326. Salehin's findings are not credible because the examination of O.C. took place five weeks after the accident, and because O.C. was diagnosed with only soft tissue sprain/strain injuries.

327. Despite having only minor injuries, Salehin referred O.C. for three separate MRI scans at the conclusion of the initial examination (i.e., right shoulder and both knees), and placed the patient on a course of treatment that involved physical therapy, chiropractic care, and acupuncture treatment.

328. O.C.'s course of treatment at the Ditmas Avenue Clinic subsequently continued for approximately two years and consisted of 76 sessions of physical therapy, 72 sessions of chiropractic treatment, 48 sessions of acupuncture treatment, and 31 cupping sessions, where the different modalities were notably found to have been rendered simultaneously on many of the dates of service.

329.    Although these modalities were clearly not leading to significant improvements in terms of symptoms or functionality, Salehin repeatedly recommended that the patient continue with this course of treatment at the Ditmas Avenue Clinic after each re-examination.

330.    With regard to medical necessity, a typical course of treatment for injuries like these would include *either* physical therapy or chiropractic care for a period four to six weeks, consisting of approximately 12 to 18 dates of service, before the patient was transitioned to a home exercise program.

331.    Consistent with this scheme, however, O.C.'s treatment simply continued unchanged and O.C.'s condition never really improved.

332.    In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic, Unicorn Acupuncture, and Eclipse Medical Imaging, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to O.C.

333.    The documentation submitted to Allstate by the defendants demonstrates that O.C. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

### 2.    Patient S.D. (Claim No. 0434867965)

334.    On November 3, 2016, the patient, S.D. (Claim No. 0434867965), presented at the Ditmas Avenue Clinic and was examined by Salehin in connection with a motor vehicle accident that allegedly occurred on November 1, 2016.

335.    Notably, the first paragraph under "General Appearance" and the finding for the assessment of the patient's head, eyes, ears, nose, mouth, chest, lung, heart, and abdomen under

the "Physical Examination" section of the initial examination report are identical to the report for the patient, O.C., excluding only the change in the patient's gender.

336.    Likewise, the assessment for the patient, S.D.'s cervical spine is nearly identical to the chart for the patient, O.C., while the assessments for the thoracic and lumbar spine are identical.

337.    Despite being only two days removed from the alleged motor vehicle accident, Salehin recommended that the patient undergo five MRI scans (i.e., left shoulder, left hip, left ankle, left elbow, and left knee) to rule out "soft tissue injur[ies]".

338.    In addition to being medically unnecessary, as conservative treatment had not yet been attempted, Salehin's recommendation that the patient undergo the five MRIs to rule out soft tissue injuries is improper, as MRIs in this course of treatment would be used instead to identify potential internal derangements.

339.    As a result of the initial examination, Salehin further recommended that the patient undergo a physical therapy consultation, chiropractic evaluation, an acupuncture visit, an aqua-med hydrotherapy evaluation, and be provided with a back brace, knee support, ankle support, and cane, all of which would be available at the Ditmas Avenue Clinic.

340.    The patient, S.D., subsequently underwent 50 sessions of physical therapy, 50 sessions of chiropractic treatment, 50 sessions of acupuncture treatment, 27 cupping sessions, and 12 aqua-med hydrotherapy sessions.

341.    In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic, Unicorn Acupuncture, and Eclipse Medical Imaging, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to S.D.

342.     These documents, however, indicate that S.D. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

### 3.     Patient D.A. (Claim No. 0460108194)

343.     Patient D.A. (Claim No. 0460108194) presented at the Ditmas Avenue Clinic on July 5, 2017 in connection with a motor vehicle accident that allegedly occurred on June 13, 2017.

344.     As documented by Salehin's initial examination report dated July 5, 2017, the patient was noted to have complaints of neck, mid and lower back, right shoulder, left ankle, and right knee pain.

345.     Despite being only three weeks post-accident, at the conclusion of the initial examination, Salehin referred the patient for an MRI of the right shoulder and right knee, and further recommended that the claimant begin the course of simultaneous treatment at the Ditmas Avenue Clinic that consisted of physical therapy, chiropractic treatment, acupuncture treatment, and aqua-med hydrotherapy therapy.

346.     Notably, the "Physical Examination" section of the July 5, 2017 initial examination report that documents the cervical spine assessment of the claimant, D.A., is verbatim to the initial examination report for the claimant, O.C., which was performed on May 26, 2016.

347.     Like that of the claimants, O.C. and S.D., the italicized formatted initial examination report for the claimant, D.A., and the additional Allstate claimants, contain identical or nearly identical physical examination assessments with identical or nearly identical "Treatment Plan" narratives regardless of the nature of the claimants' injuries or ages.

348.     The patient, D.A., was subsequently treated at the Ditmas Avenue Clinic, where the patient underwent 183 sessions of physical therapy, 186 sessions of chiropractic treatment, 225

sessions of acupuncture treatment, 138 cupping sessions, and one aqua-med hydrotherapy session, without any evidence of significant improvement over the course of this treatment.

349.    Despite this ineffective treatment, the patient was recommended to continue this course of concurrent conservative treatment by Salehin at the conclusion of each re-examination.

350.    A typical course of treatment for injuries of this nature would include *either* physical therapy or chiropractic care for a period four to six weeks, consisting of approximately 12 to 18 dates of service, before the patient was transitioned to a home exercise program.

351.    In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic, Unicorn Acupuncture, and Eclipse Medical Imaging, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to D.A.

352.    Accordingly, the documentation submitted to Allstate by the defendants is emblematic of the defendants' pre-determined treatment protocol wherein D.A. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

### 4.      Patient A. R. (Claim No. 0514319003)

353.    The patient, A.R. (Claim No. 0514319003), was evaluated by Salehin at Brooklyn Medical on August 24, 2018 in connection with a motor vehicle accident that allegedly occurred on August 21, 2018.

354.    As a result of the initial examination, A.R. was placed on the usual extensive course of physical therapy, chiropractic treatment, acupuncture treatment, and aqua-med hydrotherapy treatment with the Ditmas Avenue Clinic providers.

355.     Over the course of approximately one year, A.R. underwent 120 sessions of physical therapy, 107 sessions of chiropractic treatment, 104 sessions of acupuncture treatment, and 26 sessions of aqua-med hydrotherapy therapy, without any documented significant improvements.

356.     In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic, Unicorn Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to A.R.

357.     Accordingly, the documentation submitted to Allstate by the defendants demonstrates that A.R. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

### 5.     Patient S.M. (Claim No. 0487769648)

358.     On January 8, 2018, the patient, S.M. (Claim No. 0487769648) presented at the Ditmas Avenue Clinic in connection with a motor vehicle accident that allegedly occurred on January 2, 2018.

359.     Although the initial examination was performed by Salehin only six days post-accident, Salehin recommended that the claimant undergo an MRI of the right knee to assess for "soft tissue injury".

360.     Utilizing the template, italicized formatted initial examination report, Salehin recommended that the claimant undergo a course of physical therapy, chiropractic care, and acupuncture treatment.

361.     S.M. was subsequently treated at the Ditmas Avenue Clinic over the course of nineteen months in which the patient underwent 214 sessions of physical therapy, 216 sessions of

chiropractic treatment, 216 sessions of acupuncture treatment, 143 cupping sessions, and 146 sessions of aqua-med hydrotherapy, despite a consistent documentation of lack of efficacy for each treatment modality throughout the course of the treatment.

362.    In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic, Unicorn Acupuncture, and Eclipse Medical Imaging, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to S.M.

363.    These documents, however, indicate that S.M. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

**6.    Patient A.V. (Claim No. 0406478248)**

364.    The patient, A.V. (Claim No. 0406478248) presented to the Ditmas Avenue Clinic in connection with a motor vehicle accident that allegedly occurred on March 22, 2016.

365.    Despite the patient's relatively minor sprain and strain type injuries, A.V. was placed on an extensive course of physical therapy treatment, chiropractic care, acupuncture treatment, and cupping treatment with the Ditmas Avenue Clinic providers.

366.    Over the course of this treatment, A.V. underwent 292 sessions of physical therapy, 112 sessions of chiropractic treatment, 348 sessions of acupuncture treatment, and 172 sessions of cupping treatment, without any evidence of significant improvements in terms of symptoms or functionality.

367.    In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic,

and Unicorn Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to A.V.

368.   Accordingly, the documentation submitted to Allstate by the defendants demonstrates that A.V. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

### 7.   Patient (Claim J.S. No. 0452967102)

369.   The patient, J.S. (Claim No. 0452967102) presented at the Ditmas Avenue Clinic on July 16, 2017 in connection with a motor vehicle accident that allegedly occurred on April 10, 2017.

370.   As documented in the Brooklyn Medical initial evaluation report dated July 16, 2017, at the time of the initial evaluation, the patient had already completed approximately three months of physical therapy treatment at a different facility and had purportedly undergone arthroscopic surgery only ten days prior to the initial evaluation.

371.   Despite the three prior months of physical therapy treatment and prior arthroscopic surgery, the patient was still placed on an extensive course of physical therapy, chiropractic treatment, and acupuncture treatment.

372.   Throughout the nine-month course of treatment at the Ditmas Avenue Clinic, the patient underwent 94 sessions of physical therapy, 100 sessions of chiropractic treatment, 98 sessions of acupuncture and cupping treatment, and 68 sessions of aqua-med hydrotherapy treatment.

373.   Despite this ineffective treatment, the patient was recommended to continue this course of concurrent conservative treatment by Salehin at the conclusion of each re-examination, when a typical course of treatment for these injuries would include *either* physical therapy or

chiropractic care for a period four to six weeks, consisting of approximately 12 to 18 dates of service.

374.     In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic, and Unicorn Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to J.S.

375.     Accordingly, the documentation submitted to Allstate by the defendants is emblematic of the defendants' pre-determined treatment protocol wherein J.S. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

### 8.     Patient J. R.  (Claim No. 0471471029)

376.     The patient, J.R. (Claim No. 0471471029) presented at the Ditmas Avenue Clinic on August 16, 2017 in connection with a motor vehicle accident that allegedly occurred on August 10, 2017.

377.     Despite the fact that the initial examination took place only six days post-accident, Salehin referred the patient for MRIs of the right shoulder and right knee to rule out soft tissue injuries.

378.     Such a referral for MRIs is improper and medically unnecessary, as the patient had not attempted a course of conservative treatment and as the MRIs were not ordered to identify an internal derangement or internal joint injury.

379.     In addition to the MRIs, Salehin recommended that the patient undergo an extensive course of physical therapy, chiropractic treatment, acupuncture treatment, and aqua-med hydrotherapy treatment with the medical providers located at the Ditmas Avenue Clinic.

380.     Over a two year interval of treatment at the Ditmas Avenue Clinic, J.R. underwent 215 sessions of physical therapy, 200 sessions of chiropractic treatment, 211 sessions of acupuncture treatment, 26 sessions of cupping treatment, and 56 sessions of aqua-med hydrotherapy, in which the acupuncture, cupping and water therapy was rendered simultaneously with the physical therapy and chiropractic treatment.

381.     In connection with the treatment that was purportedly rendered to the claimant, the defendants, through Brooklyn Medical, Wellness Express PT, North Shore Family Chiropractic, Unicorn Acupuncture, and Eclipse Medical Imaging, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to J.R.

382.     These documents, however, indicated that J.R. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants at the Ditmas Avenue Clinic during the relevant period.

## VI.     SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

383.     Throughout the course of this entire scheme, Vaynshteyn, Maksumov, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang, Baldassare and Maks, working through the PC Defendants and/or Cardenal Management, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

384.     Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters and requests for payments in connection with the insurance claims reference throughout this pleading traveled through the U.S. Mail.

385.     Every automobile insurance claim detailed within, involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

### A.    AVENUE C MEDICAL ENTERPRISE

386.     Salehin, Vaynshteyn, Maksumov, and Maks either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Avenue C Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

387.     Salehin, Vaynshteyn, Maksumov, and Maks caused Avenue C Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Avenue C Medical mailed a demand for payment (i.e., invoice) to Allstate.

388.     Vaynshteyn's, Maksumov's, and Maks' management and control of Avenue C Medical, combined with Vaynshteyn's, Maksumov's, and Maks' unlawful receipt of Avenue C Medical's professional physician fees and profits, rendered Avenue C Medical completely ineligible for No-Fault reimbursement under New York law.

389.     Because Avenue C Medical was, in fact, unlawfully controlled by Vaynshteyn, Maksumov, and Maks (non-physicians), Salehin, Vaynshteyn, Maksumov, and Maks purposely

caused Avenue C Medical to make a misrepresentation each and every time that Avenue C Medical mailed a document to Allstate claiming eligibility for reimbursement.

390.     Moreover, because (a) Vaynshteyn, Maksumov, and Maks unlawfully controlled Avenue C Medical, (b) Salehin, Vaynshteyn, Maksumov, and Maks caused Avenue C Medical to seek No-Fault reimbursement from Allstate (even though Avenue C Medical was not entitled to such reimbursement), and (c) Avenue C Medical used the U.S. Mail to seek reimbursement, it is clear that Salehin, Vaynshteyn, Maksumov, and Maks committed mail fraud.

391.     At all relevant times, Salehin, Vaynshteyn, Maksumov, and Maks knew that Avenue C Medical, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Avenue C Medical.

392.     Allstate estimates that the unlawful operation of the Avenue C Medical enterprise generated thousands of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 2 and incorporated by reference as if set forth in its entirety.

### B.  HARMONY CHIROPRACTIC ENTERPRISE

393.     Lebson, Vaynshteyn, Maksumov, and Maks either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Harmony Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

394.     Lebson, Vaynshteyn, Maksumov, and Maks caused Harmony Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Harmony Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

395.     Vaynshteyn's, Maksumov's, and Maks' management and control of Harmony Chiropractic, combined with Vaynshteyn's, Maksumov's, and Maks' unlawful receipt of Harmony Chiropractic's professional physician fees and profits, rendered Harmony Chiropractic completely ineligible for No-Fault reimbursement under New York law.

396.     Because Harmony Chiropractic was, in fact, unlawfully controlled by Vaynshteyn, Maksumov, and Maks (non-physicians), Lebson, Vaynshteyn, Maksumov, and Maks purposely caused Harmony Chiropractic to make a misrepresentation each and every time that Harmony Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

397.     Moreover, because (a) Vaynshteyn, Maksumov, and Maks unlawfully controlled Harmony Chiropractic, (b) Lebson, Vaynshteyn, Maksumov, and Maks caused Harmony Chiropractic to seek No-Fault reimbursement from Allstate (even though Harmony Chiropractic was not entitled to such reimbursement), and (c) Harmony Chiropractic used the U.S. Mail to seek reimbursement, it is clear that Lebson, Vaynshteyn, Maksumov, and Maks committed mail fraud.

398.     At all relevant times, Lebson, Vaynshteyn, Maksumov, and Maks knew that Harmony Chiropractic, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Harmony Chiropractic.

399.     Allstate estimates that the unlawful operation of the Harmony Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings

made in furtherance of this scheme is annexed at Exhibit 3 and incorporated by reference as if set forth in its entirety.

### C.   VISTA ACUPUNCTURE ENTERPRISE

400.   Zhong, Vaynshteyn, Maksumov, and Maks either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Vista Acupuncture to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

401.   Zhong, Vaynshteyn, Maksumov, and Maks caused Vista Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Vista Acupuncture mailed a demand for payment (i.e., invoice) to Allstate.

402.   Vaynshteyn's, Maksumov's, and Maks' management and control of Vista Acupuncture, combined with Vaynshteyn's, Maksumov's, and Maks' unlawful receipt of Vista Acupuncture's professional physician fees and profits, rendered Vista Acupuncture completely ineligible for No-Fault reimbursement under New York law.

403.   Because Vista Acupuncture was, in fact, unlawfully controlled by Vaynshteyn, Maksumov, and Maks (persons not licensed to practice acupuncture), Zhong, Vaynshteyn, Maksumov, and Maks purposely caused Vista Acupuncture to make a misrepresentation each and every time that Vista Acupuncture mailed a document to Allstate claiming eligibility for reimbursement.

404.   Moreover, because (a) Vaynshteyn, Maksumov, and Maks unlawfully controlled Vista Acupuncture, (b) Zhong, Vaynshteyn, Maksumov, and Maks caused Vista Acupuncture to seek No-Fault reimbursement from Allstate (even though Vista Acupuncture was not entitled to

such reimbursement), and (c) Vista Acupuncture used the U.S. Mail to seek reimbursement, it is clear that Zhong, Vaynshteyn, Maksumov, and Maks committed mail fraud.

405.    At all relevant times, Zhong, Vaynshteyn, Maksumov, and Maks knew that Vista Acupuncture, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Vista Acupuncture.

406.    Allstate estimates that the unlawful operation of the Vista Acupuncture enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 4 and incorporated by reference as if set forth in its entirety.

### D.    TOTAL MOBILITY PT ENTERPRISE

407.    Jose-Dizon, Vaynshteyn, Maksumov, and Maks either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Total Mobility PT to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

408.    Jose-Dizon, Vaynshteyn, Maksumov, and Maks caused Total Mobility PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Total Mobility PT mailed a demand for payment (i.e., invoice) to Allstate.

409.    Vaynshteyn's, Maksumov's, and Maks' management and control of Total Mobility PT, combined with Vaynshteyn's, Maksumov's, and Maks' unlawful receipt of Total Mobility PT's professional physician fees and profits, rendered Total Mobility PT completely ineligible for No-Fault reimbursement under New York law.

410.  Because Total Mobility PT was, in fact, unlawfully controlled by Vaynshteyn, Maksumov, and Maks (persons not licensed to provide physical therapy), Jose-Dizon, Vaynshteyn, Maksumov, and Maks purposely caused Total Mobility PT to make a misrepresentation each and every time that Total Mobility PT mailed a document to Allstate claiming eligibility for reimbursement.

411.  Moreover, because (a) Vaynshteyn, Maksumov, and Maks unlawfully controlled Total Mobility PT, (b) Jose-Dizon, Vaynshteyn, Maksumov, and Maks caused Total Mobility PT to seek No-Fault reimbursement from Allstate (even though Total Mobility PT was not entitled to such reimbursement), and (c) Total Mobility PT used the U.S. Mail to seek reimbursement, it is clear that Jose-Dizon, Vaynshteyn, Maksumov, and Maks committed mail fraud.

412.  At all relevant times, Jose-Dizon, Vaynshteyn, Maksumov, and Maks knew that Total Mobility PT, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Total Mobility PT.

413.  Allstate estimates that the unlawful operation of the Total Mobility PT enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 5 and incorporated by reference as if set forth in its entirety.

E.  **BROOKLYN MEDICAL ENTERPRISE**

414.  Salehin, Vaynshteyn, and Maksumov either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Brooklyn Medical to be mailed

to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

415.    Salehin, Vaynshteyn, and Maksumov caused Brooklyn Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Brooklyn Medical mailed a demand for payment (i.e., invoice) to Allstate.

416.    Vaynshteyn's and Maksumov's management and control of Brooklyn Medical, combined with Vaynshteyn's and Maksumov's unlawful receipt of Brooklyn Medical's professional physician fees and profits, rendered Brooklyn Medical completely ineligible for No-Fault reimbursement under New York law.

417.    Because Brooklyn Medical was, in fact, unlawfully controlled by Vaynshteyn and Maksumov (non-physicians), Salehin, Vaynshteyn, and Maksumov purposely caused Brooklyn Medical to make a misrepresentation each and every time that Brooklyn Medical mailed a document to Allstate claiming eligibility for reimbursement.

418.    Moreover, because (a) Vaynshteyn and Maksumov unlawfully controlled Brooklyn Medical, (b) Salehin, Vaynshteyn and/or Maksumov caused Brooklyn Medical to seek No-Fault reimbursement from Allstate (even though Brooklyn Medical was not entitled to such reimbursement), and (c) Brooklyn Medical used the U.S. Mail to seek reimbursement, it is clear that Salehin, Vaynshteyn, and Maksumov committed mail fraud.

419.    At all relevant times, Salehin, Vaynshteyn, and Maksumov knew that Brooklyn Medical, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Brooklyn Medical.

420.  Allstate estimates that the unlawful operation of the Brooklyn Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

### F.  NORTH SHORE FAMILY CHIROPRACTIC ENTERPRISE

421.  Lebson, Vaynshteyn, and Maksumov either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from North Shore Family Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

422.  Lebson, Vaynshteyn, and Maksumov caused North Shore Family Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that North Shore Family Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

423.  Vaynshteyn's and Maksumov's management and control of North Shore Family Chiropractic, combined with Vaynshteyn's and Maksumov's unlawful receipt of North Shore Family Chiropractic's professional physician fees and profits, rendered North Shore Family Chiropractic completely ineligible for No-Fault reimbursement under New York law.

424.  Because North Shore Family Chiropractic was, in fact, unlawfully controlled by Vaynshteyn and Maksumov (persons not licensed to practice chiropractic), Lebson, Vaynshteyn, and Maksumov purposely caused North Shore Family Chiropractic to make a misrepresentation each and every time that North Shore Family Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

425.     Moreover, because (a) Vaynshteyn and Maksumov unlawfully controlled North Shore Family Chiropractic, (b) Lebson, Vaynshteyn and Maksumov caused North Shore Family Chiropractic to seek No-Fault reimbursement from Allstate (even though North Shore Family Chiropractic was not entitled to such reimbursement), and (c) North Shore Family Chiropractic used the U.S. Mail to seek reimbursement, it is clear that Lebson, Vaynshteyn, and Maksumov committed mail fraud.

426.     At all relevant times, Lebson, Vaynshteyn, and Maksumov knew that North Shore Family Chiropractic, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by North Shore Family Chiropractic.

427.     Allstate estimates that the unlawful operation of the North Shore Family Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 7 and incorporated by reference as if set forth in its entirety.

### G.    WELLNESS EXPRESS PT ENTERPRISE

428.     Tamayo, Vaynshteyn, and Maksumov either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Wellness Express PT to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

429.     Tamayo, Vaynshteyn, and Maksumov caused Wellness Express PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Wellness Express PT mailed a demand for payment (i.e., invoice) to Allstate.

430.     Vaynshteyn's and Maksumov's management and control of Wellness Express PT, combined with Vaynshteyn's and Maksumov's unlawful receipt of Wellness Express PT's professional physician fees and profits, rendered Wellness Express PT completely ineligible for No-Fault reimbursement under New York law.

431.     Because Wellness Express PT was, in fact, unlawfully controlled by Vaynshteyn and Maksumov (persons not licensed to practice physical therapy), Tamayo, Vaynshteyn, and Maksumov purposely caused Wellness Express PT to make a misrepresentation each and every time that Wellness Express PT mailed a document to Allstate claiming eligibility for reimbursement.

432.     Moreover, because (a) Vaynshteyn and Maksumov unlawfully controlled Wellness Express PT, (b) Tamayo, Vaynshteyn and Maksumov caused Wellness Express PT to seek No-Fault reimbursement from Allstate (even though Wellness Express PT was not entitled to such reimbursement), and (c) Wellness Express PT used the U.S. Mail to seek reimbursement, it is clear that Tamayo, Vaynshteyn, and Maksumov committed mail fraud.

433.     At all relevant times, Tamayo, Vaynshteyn, and Maksumov knew that Wellness Express PT, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Wellness Express PT.

434.     Allstate estimates that the unlawful operation of the Wellness Express PT enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 8 and incorporated by reference as if set forth in its entirety.

### H.    UNICORN ACUPUNCTURE ENTERPRISE

435.    Wang, Vaynshteyn, and Maksumov either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Unicorn Acupuncture to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

436.    Wang, Vaynshteyn, and Maksumov caused Unicorn Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Unicorn Acupuncture mailed a demand for payment (i.e., invoice) to Allstate.

437.    Vaynshteyn's and Maksumov's management and control of Unicorn Acupuncture, combined with Vaynshteyn's and Maksumov's unlawful receipt of Unicorn Acupuncture's professional physician fees and profits, rendered Unicorn Acupuncture completely ineligible for No-Fault reimbursement under New York law.

438.    Because Unicorn Acupuncture was, in fact, unlawfully controlled by Vaynshteyn and Maksumov (persons not licensed to practice acupuncture), Wang, Vaynshteyn, and Maksumov purposely caused Unicorn Acupuncture to make a misrepresentation each and every time that Unicorn Acupuncture mailed a document to Allstate claiming eligibility for reimbursement.

439.    Moreover, because (a) Vaynshteyn and Maksumov unlawfully controlled Unicorn Acupuncture, (b) Wang, Vaynshteyn and Maksumov caused Unicorn Acupuncture to seek No-Fault reimbursement from Allstate (even though Unicorn Acupuncture was not entitled to such reimbursement), and (c) Unicorn Acupuncture used the U.S. Mail to seek reimbursement, it is clear that Wang, Vaynshteyn, and Maksumov committed mail fraud.

440.    At all relevant times, Wang, Vaynshteyn, and Maksumov knew that Unicorn Acupuncture, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney,

other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Unicorn Acupuncture.

441.    Allstate estimates that the unlawful operation of the Unicorn Acupuncture enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 9 and incorporated by reference as if set forth in its entirety.

## I.    ECLIPSE MEDICAL IMAGING ENTERPRISE

442.     Baldassare, Maks, Vaynshteyn, and Maksumov either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Eclipse Medical Imaging to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

443.    Baldassare, Maks, Vaynshteyn, and Maksumov caused Eclipse Medical Imaging to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Eclipse Medical Imaging mailed a demand for payment (i.e., invoice) to Allstate.

444.    Maks', Vaynshteyn's, and Maksumov's management and control of Eclipse Medical Imaging, combined with Maks', Vaynshteyn's, and Maksumov's unlawful receipt of Eclipse Medical Imaging's professional physician fees and profits, rendered Eclipse Medical Imaging completely ineligible for No-Fault reimbursement under New York law.

445.    Because Eclipse Medical Imaging was, in fact, unlawfully controlled by Maks, Vaynshteyn, and Maksumov (persons not licensed to practice medicine or diagnostic radiology), Baldassare, Maks, Vaynshteyn, and Maksumov purposely caused Eclipse Medical Imaging to

make a misrepresentation each and every time that Eclipse Medical Imaging mailed a document to Allstate claiming eligibility for reimbursement.

446.    Moreover, because (a) Maks, Vaynshteyn, and Maksumov unlawfully owned and controlled Eclipse Medical Imaging, (b) Baldassare, Maks, Vaynshteyn, and Maksumov caused Eclipse Medical Imaging to seek No-Fault reimbursement from Allstate (even though Eclipse Medical Imaging was not entitled to such reimbursement), and (c) Eclipse Medical Imaging used the U.S. Mail to seek reimbursement, it is clear that Baldassare, Maks, Vaynshteyn, and Maksumov committed mail fraud.

447.    At all relevant times, Baldassare, Maks, Vaynshteyn, and Maksumov knew that Eclipse Medical Imaging, Cardenal Management, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Eclipse Medical Imaging.

448.    Allstate estimates that the unlawful operation of the Eclipse Medical Imaging enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 10 and incorporated by reference as if set forth in its entirety.

**J.    CARDENAL MANAGEMENT ENTERPRISE**

449.    Vanshteyn, Maksumov, Maks, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang and Baldassare either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging to be mailed to Allstate and/or

counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

450.   Vanshteyn, Maksumov, Maks, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang and Baldassare caused Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging mailed a demand for payment (i.e., invoice) to Allstate.

451.   Maks', Vaynshteyn's, and Maksumov's management and control of Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging, combined with Maks', Vaynshteyn's, and Maksumov's unlawful receipt of Avenue C Medical's, Harmony Chiropractic's, Vista Acupuncture's, Total Mobility PT's, Brooklyn Medical's, North Shore Family Chiropractic's, Wellness Express PT's, Unicorn Acupuncture's, and Eclipse Medical Imaging's professional physician fees and profits, rendered Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging completely ineligible for No-Fault reimbursement under New York law.

452.   Because Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging were, in fact, unlawfully controlled by Maks,

Vaynshteyn, and Maksumov (persons not licensed to practice medicine, chiropractic, physical therapy, acupuncture or diagnostic radiology), Vanshteyn, Maksumov, Maks, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang and Baldassare purposely caused Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging to make a misrepresentation each and every time that Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging mailed a document to Allstate claiming eligibility for reimbursement.

453. Moreover, because (a) Maks, Vaynshteyn, and Maksumov unlawfully owned and controlled Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging, (b) Vanshteyn, Maksumov, Maks, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang and Baldassare caused Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging to seek No-Fault reimbursement from Allstate (even though Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging were not entitled to such reimbursement), and (c) Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging used the U.S. Mail to seek reimbursement, it is clear that Vanshteyn,

Maksumov, Maks, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang and Baldassare committed mail fraud.

454.    At all relevant times, Vanshteyn, Maksumov, Maks, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang and Baldassare knew that Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging.

455.    Allstate estimates that the unlawful operation of the Eclipse Medical Imaging enterprise generated thousands of mailings. Tables highlighting selected examples of mailings made in furtherance of this scheme is annexed Exhibits 2-10 and incorporated by reference as if set forth in its entirety.

## VII.   SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE AVENUE C MEDICAL ENTERPRISE

456.     Vaynshteyn and/or Maksumov induced Salehin to register himself with the State of New York as Avenue C Medical's sole officer, director, and shareholder.

457.    The documents created and filed with the State of New York related to Avenue C Medical deliberately omitted any reference to Vaynshteyn's, Maksumov's, Maks' or Cardenal Management's involvement with Salehin or Avenue C Medical.

458.     Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Avenue C Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's, Maksumov's, and Maks' domination of and control over Salehin and Avenue C Medical.

459.     Vaynshteyn's, Maksumov's, Maks' and Salehin's purposeful concealment of Vaynshteyn's, Maksumov's, and Maks; controlling interest in Avenue C Medical allowed Vaynshteyn, Maksumov, and Maks to unlawfully control Avenue C Medical undetected.

460.     At all times relevant during the operation of the Avenue C Medical enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Avenue C Medical, Vaynshteyn, Maksumov, Maks and Salehin caused Avenue C Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

461.     In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of Avenue C Medical, and thus caused Avenue C Medical to falsely claim eligibility for No-Fault reimbursement.

462.     Maks managed the day-to-day operation of Avenue C Medical and the McDonald Avenue Clinic, and therefore participated in the operation and control of Avenue C Medical, and also caused Avenue C Medical to falsely claim eligibility for No-Fault reimbursement.

463.     Further, Salehin attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Avenue C Medical patients, as well as the validity of the charges for such services.

464.    At all relevant times, Salehin, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

465.    At all relevant times, Vaynshteyn, Maksumov, Maks, and Salehin actively concealed from Allstate facts regarding Avenue C Medical's true ownership and control to prevent Allstate from discovering that Avenue C Medical was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

466.    Many of these facts—particularly Avenue C Medical's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, Maks, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

467.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

468.    Thus, every time that Vaynshteyn, Maksumov, Maks, and Salehin (along with those individuals working under their control) caused Avenue C Medical to submit No-Fault reimbursement demands to Allstate, Vaynshteyn, Maksumov, Maks, and Salehin (and those individuals working under their control) necessarily certified that Avenue C Medical was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

469.    The full extent of Vaynshteyn's, Maksumov's, Maks', and Salehin's fraudulent and unlawful acts relative to their control over the Avenue C Medical enterprise—including (a) Vaynshteyn's, Maksumov's, and Maks' management and control of Avenue C Medical, and (b)

the unlawful channeling of Avenue C Medical's professional proceeds to Vaynshteyn and

Maksumov, personally and through Cardenal Management—was not, and could not have been,

known to Allstate until it commenced this action.

**B.** **FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE HARMONY CHIROPRACTIC ENTERPRISE**

470.     Vaynshteyn and/or Maksumov induced Lebson to register himself with the State

of New York as Harmony Chiropractic's sole officer, director, and shareholder.

471.    The documents created and filed with the State of New York related to Harmony

Chiropractic deliberately omitted any reference to Vaynshteyn's, Maksumov's, Maks' or Cardenal

Management's involvement with Lebson or Harmony Chiropractic.

472.    Based on representations contained within the four corners of the documents filed

with the State of New York on behalf of Harmony Chiropractic, Allstate—even acting with

reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's,

Maksumov's, and Maks' domination of and control over Lebson and Harmony Chiropractic.

473.    Vaynshteyn's, Maksumov's, Maks' and Lebson's purposeful concealment of

Vaynshteyn's, Maksumov's, and Maks' controlling interest in Harmony Chiropractic allowed

Vaynshteyn, Maksumov, and Maks to unlawfully control Harmony Chiropractic undetected.

474.    At all times relevant during the operation of the Harmony Chiropractic enterprise,

to induce Allstate to pay promptly charges for health care services purportedly provided to patients

who treated at Harmony Chiropractic, Vaynshteyn, Maksumov, Maks and Lebson caused

Harmony Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under

New York's No-Fault Laws.

475.    In their personal capacity and in their capacity as the co-owners of Cardenal

Management, Vaynshteyn and Maksumov directly participated in the operation and control of

Harmony Chiropractic, and thus caused Harmony Chiropractic to falsely claim eligibility for No-Fault reimbursement.

476.   Maks managed the day-to-day operation of Harmony Chiropractic and the McDonald Avenue Clinic, and therefore participated in the operation and control of Harmony Chiropractic, and also caused Harmony Chiropractic to falsely claim eligibility for No-Fault reimbursement.

477.   Further, Lebson attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Harmony Chiropractic patients, as well as the validity of the charges for such services.

478.   At all relevant times, Lebson, as a duly licensed chiropractor, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

479.   At all relevant times, Vaynshteyn, Maksumov, Maks, and Lebson actively concealed from Allstate facts regarding Harmony Chiropractic's true ownership and control to prevent Allstate from discovering that Harmony Chiropractic was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

480.   Many of these facts—particularly Harmony Chiropractic's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, Maks, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

481.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

482.    Thus, every time that Vaynshteyn, Maksumov, Maks, and Lebson (along with those individuals working under their control) caused Harmony Chiropractic to submit No-Fault reimbursement demands to Allstate, Vaynshteyn, Maksumov, Maks, and Lebson (and those individuals working under their control) necessarily certified that Harmony Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

483.    The full extent of Vaynshteyn's, Maksumov's, Maks', and Lebson's fraudulent and unlawful acts relative to their control over the Harmony Chiropractic enterprise—including (a) Vaynshteyn's, Maksumov's, and Maks' management and control of Harmony Chiropractic, and (b) the unlawful channeling of Harmony Chiropractic's professional proceeds to Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

## C.    FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE VISTA ACUPUNCTURE ENTERPRISE

484.    Vaynshteyn and/or Maksumov induced Zhong to register himself with the State of New York as Vista Acupuncture's sole officer, director, and shareholder.

485.    The documents created and filed with the State of New York related to Vista Acupuncture deliberately omitted any reference to Vaynshteyn's, Maksumov's, or Cardenal Management's involvement with Zhong or Vista Acupuncture.

486.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Vista Acupuncture, Allstate—even acting with reasonable

diligence—could not possibly have discovered the nature and extent of Vaynshteyn's and Maksumov's domination of and control over Zhong and Vista Acupuncture.

487.     Vaynshteyn's, Maksumov's, and Zhong's purposeful concealment of Vaynshteyn's and Maksumov's controlling interest in Vista Acupuncture allowed Vaynshteyn and Maksumov to unlawfully control Vista Acupuncture undetected.

488.     At all times relevant during the operation of the Vista Acupuncture enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Vista Acupuncture, Vaynshteyn, Maksumov, and Zhong caused Vista Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

489.     In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of Vista Acupuncture, and thus caused Vista Acupuncture to falsely claim eligibility for No-Fault reimbursement.

490.     Maks managed the day-to-day operation of Vista Acupuncture and the McDonald Avenue Clinic, and therefore participated in the operation and control of Vista Acupuncture, and also caused Vista Acupuncture to falsely claim eligibility for No-Fault reimbursement.

491.     Further, Zhong attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Vista Acupuncture patients, as well as the validity of the charges for such services.

492.     At all relevant times, Zhong, as a duly licensed acupuncturist, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

493. At all relevant times, Vaynshteyn, Maksumov, and Zhong actively concealed from Allstate facts regarding Vista Acupuncture's true ownership and control to prevent Allstate from discovering that Vista Acupuncture was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

494. Many of these facts—particularly Vista Acupuncture's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

495. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

496. Thus, every time that Vaynshteyn, Maksumov, and Zhong (along with those individuals working under their control) caused Vista Acupuncture to submit No-Fault reimbursement demands to Allstate, Vaynshteyn, Maksumov, and Zhong (and those individuals working under their control) necessarily certified that Vista Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

497. The full extent of Vaynshteyn's, Maksumov's, and Zhong's fraudulent and unlawful acts relative to their control over the Vista Acupuncture enterprise—including (a) Vaynshteyn's and Maksumov's management and control of Vista Acupuncture, and (b) the unlawful channeling of Vista Acupuncture's professional proceeds to Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

**D.    FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE TOTAL MOBILITY PT ENTERPRISE**

498.    Vaynshteyn and/or Maksumov induced Jose-Dizon to register herself with the State of New York as Total Mobility PT's sole officer, director, and shareholder.

499.    The documents created and filed with the State of New York related to Total Mobility PT deliberately omitted any reference to Vaynshteyn's, Maksumov's, or Cardenal Management's involvement with Jose-Dizon or Total Mobility PT.

500.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Total Mobility PT, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's and Maksumov's domination of and control over Jose-Dizon and Total Mobility PT.

501.    Vaynshteyn's, Maksumov's, and Jose-Dizon's purposeful concealment of Vaynshteyn's and Maksumov's controlling interest in Total Mobility PT allowed Vaynshteyn and Maksumov to unlawfully control Total Mobility PT undetected.

502.    At all times relevant during the operation of the Total Mobility PT enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Total Mobility PT, Vaynshteyn, Maksumov, and Jose-Dizon caused Total Mobility PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

503.    In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of Total Mobility PT, and thus caused Total Mobility PT to falsely claim eligibility for No-Fault reimbursement.

504.     Maks managed the day-to-day operation of Total Mobility PT and the McDonald Avenue Clinic, and therefore participated in the operation and control of Total Mobility PT, and also caused Total Mobility PT to falsely claim eligibility for No-Fault reimbursement.

505.     Further, Jose-Dizon attested (or caused the attestation) to the medical necessity of the services that he (or persons under her direction and control) allegedly performed in connection with Total Mobility PT patients, as well as the validity of the charges for such services.

506.     At all relevant times, Jose-Dizon, as a duly licensed physical therapist, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of her oath as a licensed medical professional.

507.     At all relevant times, Vaynshteyn, Maksumov, and Jose-Dizon actively concealed from Allstate facts regarding Total Mobility PT's true ownership and control to prevent Allstate from discovering that Total Mobility PT was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

508.     Many of these facts—particularly Total Mobility PT's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

509.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

510.     Thus, every time that Vaynshteyn, Maksumov, and Jose-Dizon (along with those individuals working under their control) caused Total Mobility PT to submit No-Fault

reimbursement demands to Allstate, Vaynshteyn, Maksumov, and Jose-Dizon (and those individuals working under their control) necessarily certified that Total Mobility PT was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

511.    The full extent of Vaynshteyn's, Maksumov's, and Jose-Dizon's fraudulent and unlawful acts relative to their control over the Total Mobility PT enterprise—including (a) Vaynshteyn's and Maksumov's management and control of Total Mobility PT, and (b) the unlawful channeling of Total Mobility PT's professional proceeds to Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

### E.    FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE BROOKLYN MEDICAL ENTERPRISE

512.    Vaynshteyn and/or Maksumov induced Salehin to register himself with the State of New York as Brooklyn Medical's sole officer, director, and shareholder.

513.    The documents created and filed with the State of New York related to Brooklyn Medical deliberately omitted any reference to Vaynshteyn's, Maksumov's, or Cardenal Management's involvement with Salehin or Brooklyn Medical.

514.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Brooklyn Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's and Maksumov's domination of and control over Salehin and Brooklyn Medical.

515.    Vaynshteyn's, Maksumov's, and Salehin's purposeful concealment of Vaynshteyn's and Maksumov's controlling interest in Brooklyn Medical allowed Vaynshteyn and Maksumov to unlawfully control Brooklyn Medical undetected.

516.     At all times relevant during the operation of the Brooklyn Medical enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Brooklyn Medical, Vaynshteyn, Maksumov, and Salehin caused Brooklyn Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

517.     In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of Brooklyn Medical, and thus caused Brooklyn Medical to falsely claim eligibility for No-Fault reimbursement.

518.     Further, Salehin attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Brooklyn Medical patients, as well as the validity of the charges for such services.

519.     At all relevant times, Salehin, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

520.     At all relevant times, Vaynshteyn, Maksumov, and Salehin actively concealed from Allstate facts regarding Brooklyn Medical's true ownership and control to prevent Allstate from discovering that Brooklyn Medical was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

521.     Many of these facts—particularly Brooklyn Medical's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants

and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

522.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

523.     Thus, every time that Vaynshteyn, Maksumov, and Salehin (along with those individuals working under their control) caused Brooklyn Medical to submit No-Fault reimbursement demands to Allstate, Vaynshteyn, Maksumov, and Salehin (and those individuals working under their control) necessarily certified that Brooklyn Medical was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

524.     The full extent of Vaynshteyn's, Maksumov's, and Salehin's fraudulent and unlawful acts relative to their control over the Brooklyn Medical enterprise—including (a) Vaynshteyn's and Maksumov's management and control of Brooklyn Medical, and (b) the unlawful channeling of Brooklyn Medical's professional proceeds to Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

**F.     FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE NORTH SHORE FAMILY CHIROPRACTIC ENTERPRISE**

525.     Vaynshteyn and/or Maksumov induced Lebson to register himself with the State of New York as North Shore Family Chiropractic's sole officer, director, and shareholder.

526.     The documents created and filed with the State of New York related to North Shore Family Chiropractic deliberately omitted any reference to Vaynshteyn's, Maksumov's, or Cardenal Management's involvement with Lebson or North Shore Family Chiropractic.

527.     Based on representations contained within the four corners of the documents filed with the State of New York on behalf of North Shore Family Chiropractic, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's and Maksumov's domination of and control over Lebson and North Shore Family Chiropractic.

528.     Vaynshteyn's, Maksumov's, and Lebson's purposeful concealment of Vaynshteyn's and Maksumov's controlling interest in North Shore Family Chiropractic allowed Vaynshteyn and Maksumov to unlawfully control North Shore Family Chiropractic undetected.

529.     At all times relevant during the operation of the North Shore Family Chiropractic enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at North Shore Family Chiropractic, Vaynshteyn, Maksumov, and Lebson caused North Shore Family Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

530.     In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of North Shore Family Chiropractic, and thus caused North Shore Family Chiropractic to falsely claim eligibility for No-Fault reimbursement.

531.     Further, Lebson attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with North Shore Family Chiropractic patients, as well as the validity of the charges for such services.

532.     At all relevant times, Lebson, as a duly licensed chiropractor, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

533.     At all relevant times, Vaynshteyn, Maksumov, and Lebson actively concealed from Allstate facts regarding North Shore Family Chiropractic's true ownership and control to prevent Allstate from discovering that North Shore Family Chiropractic was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

534.     Many of these facts—particularly North Shore Family Chiropractic's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

535.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

536.     Thus, every time that Vaynshteyn, Maksumov, and Lebson (along with those individuals working under their control) caused North Shore Family Chiropractic to submit No-Fault reimbursement demands to Allstate, Vaynshteyn, Maksumov, and Lebson (and those individuals working under their control) necessarily certified that North Shore Family Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

537.     The full extent of Vaynshteyn's, Maksumov's, and Lebson's fraudulent and unlawful acts relative to their control over the North Shore Family Chiropractic enterprise—

including (a) Vaynshteyn's and Maksumov's management and control of North Shore Family Chiropractic, and (b) the unlawful channeling of North Shore Family Chiropractic's professional proceeds to Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

### G.   FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE WELLNESS EXPRESS PT ENTERPRISE

538.   Vaynshteyn and/or Maksumov induced Tamayo to register himself with the State of New York as Wellness Express PT's sole officer, director, and shareholder.

539.   The documents created and filed with the State of New York related to Wellness Express PT deliberately omitted any reference to Vaynshteyn's, Maksumov's, or Cardenal Management's involvement with Tamayo or Wellness Express PT.

540.   Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Wellness Express PT, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's and Maksumov's domination of and control over Tamayo and Wellness Express PT.

541.   Vaynshteyn's, Maksumov's, and Tamayo's purposeful concealment of Vaynshteyn's and Maksumov's controlling interest in Wellness Express PT allowed Vaynshteyn and Maksumov to unlawfully control Wellness Express PT undetected.

542.   At all times relevant during the operation of the Wellness Express PT enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Wellness Express PT, Vaynshteyn, Maksumov, and Tamayo caused Wellness Express PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

543.    In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of Wellness Express PT, and thus caused Wellness Express PT to falsely claim eligibility for No-Fault reimbursement.

544.    Further, Tamayo attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Wellness Express PT patients, as well as the validity of the charges for such services.

545.    At all relevant times, Tamayo, as a duly licensed physical therapist, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

546.    At all relevant times, Vaynshteyn, Maksumov, and Tamayo actively concealed from Allstate facts regarding Wellness Express PT's true ownership and control to prevent Allstate from discovering that Wellness Express PT was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

547.    Many of these facts—particularly Wellness Express PT's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

548.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

549.     Thus, every time that Vaynshteyn, Maksumov, and Tamayo (along with those individuals working under their control) caused Wellness Express PT to submit No-Fault reimbursement demands to Allstate, Vaynshteyn, Maksumov, and Tamayo (and those individuals working under their control) necessarily certified that Wellness Express PT was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

550.     The full extent of Vaynshteyn's, Maksumov's, and Tamayo's fraudulent and unlawful acts relative to their control over the Wellness Express PT enterprise—including (a) Vaynshteyn's and Maksumov's management and control of Wellness Express PT, and (b) the unlawful channeling of Wellness Express PT's professional proceeds to Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

### H.     FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE UNICORN ACUPUNCTURE ENTERPRISE

551.     Vaynshteyn and/or Maksumov induced Wang to register himself with the State of New York as Unicorn Acupuncture's sole officer, director, and shareholder.

552.     The documents created and filed with the State of New York related to Unicorn Acupuncture deliberately omitted any reference to Vaynshteyn's, Maksumov's, or Cardenal Management's involvement with Wang or Unicorn Acupuncture.

553.     Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Unicorn Acupuncture, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Vaynshteyn's and Maksumov's domination of and control over Wang and Unicorn Acupuncture.

554. Vaynshteyn's, Maksumov's, and Wang's purposeful concealment of Vaynshteyn's and Maksumov's controlling interest in Unicorn Acupuncture allowed Vaynshteyn and Maksumov to unlawfully control Unicorn Acupuncture undetected.

555. At all times relevant during the operation of the Unicorn Acupuncture enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Unicorn Acupuncture, Vaynshteyn, Maksumov, and Wang caused Unicorn Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

556. In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of Unicorn Acupuncture, and thus caused Unicorn Acupuncture to falsely claim eligibility for No-Fault reimbursement.

557. Further, Wang attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Unicorn Acupuncture patients, as well as the validity of the charges for such services.

558. At all relevant times, Wang, as a duly licensed acupuncturist, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

559. At all relevant times, Vaynshteyn, Maksumov, and Wang actively concealed from Allstate facts regarding Unicorn Acupuncture's true ownership and control to prevent Allstate from discovering that Unicorn Acupuncture was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

560.     Many of these facts—particularly Unicorn Acupuncture's splitting of professional physician fees and profits with Vaynshteyn, Maksumov, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

561.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

562.     Thus, every time that Vaynshteyn, Maksumov, and Wang (along with those individuals working under their control) caused Unicorn Acupuncture to submit No-Fault reimbursement demands to Allstate, Vaynshteyn, Maksumov, and Wang (and those individuals working under their control) necessarily certified that Unicorn Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

563.     The full extent of Vaynshteyn's, Maksumov's, and Wang's fraudulent and unlawful acts relative to their control over the Unicorn Acupuncture enterprise—including (a) Vaynshteyn's and Maksumov's management and control of Unicorn Acupuncture, and (b) the unlawful channeling of Unicorn Acupuncture's professional proceeds to Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

I.     **FRAUDULENT CONCEALMENT OF VAYNSHTEYN'S AND MAKSUMOV'S UNLAWFUL CONTROL OF THE ECLIPSE MEDICAL IMAGING ENTERPRISE**

564.     Maks, Vaynshteyn and/or Maksumov induced Baldassare to register himself with the State of New York as Eclipse Medical Imaging's sole officer, director, and shareholder.

565.     The documents created and filed with the State of New York related to Eclipse Medical Imaging deliberately omitted any reference to Maks', Vaynshteyn's, Maksumov's, or Cardenal Management's involvement with Baldassare or Eclipse Medical Imaging.

566.     Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Eclipse Medical Imaging, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Maks', Vaynshteyn's and Maksumov's domination of and control over Baldassare and Eclipse Medical Imaging.

567.     Maks', Vaynshteyn's, Maksumov's, and Baldassare's purposeful concealment of Maks', Vaynshteyn's and Maksumov's controlling interest in Eclipse Medical Imaging allowed Maks, Vaynshteyn and Maksumov to unlawfully control Eclipse Medical Imaging undetected.

568.     At all times relevant during the operation of the Eclipse Medical Imaging enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Eclipse Medical Imaging, Maks, Vaynshteyn, Maksumov, and Baldassare caused Eclipse Medical Imaging to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

569.     In their personal capacity and in their capacity as the co-owners of Cardenal Management, Vaynshteyn and Maksumov directly participated in the operation and control of Eclipse Medical Imaging, and thus caused Eclipse Medical Imaging to falsely claim eligibility for No-Fault reimbursement.

570.     Maks directly participated in the unlawful ownership, operation, and control of Eclipse Medical Imaging and the Coney Island Avenue Clinic, and thus caused Eclipse Medical Imaging to falsely claim eligibility for No-Fault reimbursement.

571.     Further, Baldassare attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Eclipse Medical Imaging patients, as well as the validity of the charges for such services.

572.     At all relevant times, Baldassare, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

573.     At all relevant times, Maks, Vaynshteyn, Maksumov, and Baldassare actively concealed from Allstate facts regarding Eclipse Medical Imaging's true ownership and control to prevent Allstate from discovering that Eclipse Medical Imaging was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

574.     Many of these facts—particularly Eclipse Medical Imaging's splitting of professional physician fees and profits with Maks, Vaynshteyn, Maksumov, and Cardenal Management—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

575.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

576.     Thus, every time that Maks, Vaynshteyn, Maksumov, and Baldassare (along with those individuals working under their control) caused Eclipse Medical Imaging to submit No-Fault reimbursement demands to Allstate, Maks, Vaynshteyn, Maksumov, and Baldassare (and those

individuals working under their control) necessarily certified that Eclipse Medical Imaging was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

577.    The full extent of Maks', Vaynshteyn's, Maksumov's, and Baldassare's fraudulent and unlawful acts relative to their control over the Eclipse Medical Imaging enterprise—including (a) Maks', Vaynshteyn's and Maksumov's management and control of Eclipse Medical Imaging, and (b) the unlawful channeling of Eclipse Medical Imaging's professional proceeds to Maks, Vaynshteyn and Maksumov, personally and through Cardenal Management—was not, and could not have been, known to Allstate until it commenced this action.

### J.    ALLSTATE'S JUSTIFIABLE RELIANCE

578.    Each claim submitted to Allstate by (or on behalf of) Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging, was verified pursuant to Insurance Law § 403.

579.    At all relevant times, Salehin, Lebson, Zhong, Jose-Dizon, Tamayo, Wang, and Baldassare, as a duly licensed healthcare providers, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with any other aspect of their oath as a licensed medical professional.

580.    To induce Allstate to promptly pay Avenue C Medical's, Harmony Chiropractic's, Vista Acupuncture's, Total Mobility PT's, Brooklyn Medical's, North Shore Family Chiropractic's, Wellness Express PT's, Unicorn Acupuncture's, and Eclipse Medical Imaging's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or other invoices certifying that Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn

Acupuncture, and Eclipse Medical Imaging were eligible to be reimbursed under New York's No-Fault Laws.

581.     Further, to induce Allstate to promptly pay the fraudulent charges for healthcare tests and services purportedly provided to patients of Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging, the defendants hired law firms to pursue collection of the fraudulent charges from Allstate. These law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Avenue C Medical's, Harmony Chiropractic's, Vista Acupuncture's, Total Mobility PT's, Brooklyn Medical's, North Shore Family Chiropractic's, Wellness Express PT's, Unicorn Acupuncture's, and Eclipse Medical Imaging's charges are not paid in full.

582.     Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

583.     At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Avenue C Medical's, Harmony Chiropractic's, Vista Acupuncture's, Total Mobility PT's, Brooklyn Medical's, North Shore Family Chiropractic's, Wellness Express PT's, Unicorn Acupuncture's, and Eclipse Medical Imaging's reimbursement eligibility under New York law.

584.     In reasonable reliance on these misrepresentations, Allstate paid money to Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical,

North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging to its detriment.

585.    Allstate would not have paid these monies had the defendants provided true and accurate information about Avenue C Medical's, Harmony Chiropractic's, Vista Acupuncture's, Total Mobility PT's, Brooklyn Medical's, North Shore Family Chiropractic's, Wellness Express PT's, Unicorn Acupuncture's, and Eclipse Medical Imaging's reimbursement eligibility under New York law, including the fact and necessity of the services provided.

## VIII.   DAMAGES

586.    The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments made in connection with first-party claims in excess of $3,076,251.63, the exact amount to be determined at trial, including:

(a) Payments made to Avenue C Medical in connection with first-party claims in excess of $1,370,302.67, the exact amount to be determined at trial. The chart annexed as Exhibit 11, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Avenue C Medical in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b) Payments made to Harmony Chiropractic in connection with first-party claims in excess of $558,115.71, the exact amount to be determined at trial.  The chart annexed as Exhibit 12, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Harmony Chiropractic in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(c)  Payments made to Vista Acupuncture in connection with first-party claims in excess of $225,458.43, the exact amount to be determined at trial. The chart annexed as Exhibit 13, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Vista Acupuncture in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(d)  Payments made to Total Mobility PT in connection with first-party claims in excess of $118,409.84, the exact amount to be determined at trial. The chart annexed as Exhibit 14, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Total Mobility PT in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(e)  Payments made to Brooklyn Medical in connection with first-party claims in excess of $273,142.95, the exact amount to be determined at trial. The chart annexed as Exhibit 15, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Brooklyn Medical in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(f)  Payments made to North Shore Family Chiropractic in connection with first-party claims in excess of $132,328.73, the exact amount to be determined at trial. The chart annexed as Exhibit 16, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to North Shore Family Chiropractic in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(g)  Payments made to Wellness Express PT in connection with first-party claims in excess of $16,002.60, the exact amount to be determined at trial. The chart annexed as Exhibit

17, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Wellness Express PT in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(h) Payments made to Unicorn Acupuncture in connection with first-party claims in excess of $144,253.03, the exact amount to be determined at trial. The chart annexed as Exhibit 18, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Unicorn Acupuncture in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(i) Payments made to Eclipse Medical Imaging in connection with first-party claims in excess of $238,237.67, the exact amount to be determined at trial. The chart annexed as Exhibit 19, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Eclipse Medical Imaging in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## IX.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### AVENUE C MEDICAL, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Sayeedus Salehin, M.D.)

587.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

588.    Avenue C Medical, P.C. ("Avenue C Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

589.    In connection with the operation and management of the Avenue C Medical enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert

Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Sayeedus Salehin, M.D.  (collectively "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Avenue C Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Avenue C Medical would occur, in furtherance of their scheme to defraud.

590.    The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 2.

591.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

592.    Policies of insurance were delivered to insureds through the U.S. Mail.

593.    Payments to Avenue C Medical traveled through the U.S. Mail.

594.    As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Avenue C Medical, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

595.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Avenue C Medical for the benefit of the Count I Defendants that would not otherwise have been paid.

596.     The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

597.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

598.     By mailing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

599.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Avenue C Medical for the benefit of the Count I Defendants.

600.     The Count I Defendants participated in the conduct of the Avenue C Medical enterprise through a pattern of racketeering activities.

601.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

602.     The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

603.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

604.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

605.     By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION 18 U.S.C. § 1962(d)
### AVENUE C MEDICAL, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Sayeedus Salehin, M.D.)

606.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

607.    Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Sayeedus Salehin, M.D. (collectively "Count II Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Avenue C Medical, P.C. ("Avenue C Medical").

608.    The Count II Defendants each agreed to further, facilitate, support, and operate the Avenue C Medical enterprise.

609.    As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

610.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Avenue C Medical even though Avenue C Medical was not eligible to collect such benefits by virtue of its unlawful conduct.

611.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

612.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count II Defendants' unlawful conduct described herein.

613.    By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**HARMONY CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Todd L. Lebson, D.C.)**

614.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

615.    Harmony Chiropractic, P.C. ("Harmony Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

616.    In connection with the operation and management of the Harmony Chiropractic enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Todd L. Lebson, D.C. (collectively "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Harmony Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Harmony Chiropractic would occur, in furtherance of their scheme to defraud.

617.    The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 3.

618.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

619.    Policies of insurance were delivered to insureds through the U.S. Mail.

620.    Payments to Harmony Chiropractic traveled through the U.S. Mail.

621.    As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Harmony Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

622.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Harmony Chiropractic for the benefit of the Count III Defendants that would not otherwise have been paid.

623.    The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

624.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

625.    By mailing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

626.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Harmony Chiropractic for the benefit of the Count III Defendants.

627.    The Count III Defendants participated in the conduct of the Harmony Chiropractic enterprise through a pattern of racketeering activities.

628.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

629.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

630.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

631.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

632.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IV
### VIOLATION 18 U.S.C. § 1962(d)
### HARMONY CHIROPRACTIC, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Todd L. Lebson, D.C.)

633.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

634.    Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Todd L. Lebson, D.C. (collectively "Count IV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Harmony Chiropractic, P.C. ("Harmony Chiropractic").

635.     The Count IV Defendants each agreed to further, facilitate, support, and operate the Harmony Chiropractic enterprise.

636.     As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

637.     The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Harmony Chiropractic even though Harmony Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

638.     The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

639.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

640.     By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**VISTA ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Zhi-Yuan Zhong, L.Ac.)**

641.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

642.     Vista Acupuncture, P.C. ("Vista Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

643.     In connection with the operation and management of the Vista Acupuncture enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Zhi-Yuan Zhong, L.Ac. (collectively "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Vista Acupuncture's business, or should have reasonably foreseen that the mailing of such false medical documentation by Vista Acupuncture would occur, in furtherance of their scheme to defraud.

644.     The Count V Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 4.

645.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

646.     Policies of insurance were delivered to insureds through the U.S. Mail.

647.     Payments to Vista Acupuncture traveled through the U.S. Mail.

648.     As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Vista Acupuncture, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

649.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Vista Acupuncture for the benefit of the Count V Defendants that would not otherwise have been paid.

650.     The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

651.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

652.     By mailing numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

653.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Vista Acupuncture for the benefit of the Count V Defendants.

654.     The Count V Defendants participated in the conduct of the Vista Acupuncture enterprise through a pattern of racketeering activities.

655.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

656.     The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

657.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

658.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

659. By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION 18 U.S.C. § 1962(d)**
**VISTA ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Zhi-Yuan Zhong, L.Ac.)**

660. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

661. Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Zhi-Yuan Zhong, L.Ac. (collectively "Count VI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Vista Acupuncture, P.C. ("Vista A").

662. The Count VI Defendants each agreed to further, facilitate, support, and operate the Vista Acupuncture enterprise.

663. As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

664. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Vista Acupuncture even though Vista Acupuncture was not eligible to collect such benefits by virtue of its unlawful conduct.

665. The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

666.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count VI Defendants' unlawful conduct described herein.

667.    By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### TOTAL MOBILITY PT, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Carmen Maria Donna Jose-Dizon, P.T.)

668.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

669.    Total Mobility PT, P.C. ("Total Mobility PT") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

670.    In connection with the operation and management of the Total Mobility PT enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Carmen Maria Donna Jose-Dizon, P.T.  (collectively "Count VII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Total Mobility PT's business, or should have reasonably foreseen that the mailing of such false medical documentation by Total Mobility PT would occur, in furtherance of their scheme to defraud.

671.     The Count VII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 5.

672.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

673.     Policies of insurance were delivered to insureds through the U.S. Mail.

674.     Payments to Total Mobility PT traveled through the U.S. Mail.

675.     As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Total Mobility PT, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

676.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Total Mobility PT for the benefit of the Count VII Defendants that would not otherwise have been paid.

677.     The Count VII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

678.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

679.    By mailing numerous fraudulent claims in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

680.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Total Mobility PT for the benefit of the Count VII Defendants.

681.    The Count VII Defendants participated in the conduct of the Total Mobility PT enterprise through a pattern of racketeering activities.

682.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

683.    The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

684.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

685.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

686.    By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION 18 U.S.C. § 1962(d)
### TOTAL MOBILITY PT, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Carmen Maria Donna Jose-Dizon, P.T.)

687.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

688.    Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Carmen Maria Donna Jose-Dizon, P.T. (collectively "Count VIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Total Mobility PT, P.C. ("Total Mobility PT").

689.    The Count VIII Defendants each agreed to further, facilitate, support, and operate the Total Mobility PT enterprise.

690.    As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

691.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Total Mobility PT even though Total Mobility PT was not eligible to collect such benefits by virtue of its unlawful conduct.

692.    The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

693.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count VIII Defendants' unlawful conduct described herein.

694.    By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BROOKLYN MEDICAL PRACTICE, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.**
**and Sayeedus Salehin, M.D.)**

695.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

696.    Brooklyn Medical Practice, P.C. ("Brooklyn Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

697.    In connection with the operation and management of the Brooklyn Medical enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., and Sayeedus Salehin, M.D. (collectively "Count IX Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Brooklyn Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Brooklyn Medical would occur, in furtherance of their scheme to defraud.

698.    The Count IX Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

699.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

700.    Policies of insurance were delivered to insureds through the U.S. Mail.

701.    Payments to Brooklyn Medical traveled through the U.S. Mail.

702.    As documented above, the Count IX Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Brooklyn Medical, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

703.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Brooklyn Medical for the benefit of the Count IX Defendants that would not otherwise have been paid.

704.    The Count IX Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

705.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

706.    By mailing numerous fraudulent claims in an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

707.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Brooklyn Medical for the benefit of the Count IX Defendants.

708.    The Count IX Defendants participated in the conduct of the Brooklyn Medical enterprise through a pattern of racketeering activities.

709.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

710.    The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

711.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

712.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

713.    By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT X
### VIOLATION 18 U.S.C. § 1962(d)
### BROOKLYN MEDICAL PRACTICE, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Sayeedus Salehin, M.D.)

714.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

715.    Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Sayeedus Salehin, M.D. (collectively "Count X Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Brooklyn Medical Practice, P.C. ("Brooklyn Medical").

716.    The Count X Defendants each agreed to further, facilitate, support, and operate the Brooklyn Medical enterprise.

717.    As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

718.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Brooklyn Medical even though Brooklyn Medical was not eligible to collect such benefits by virtue of its unlawful conduct.

719.    The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

720.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count X Defendants' unlawful conduct described herein.

721.    By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NORTH SHORE FAMILY CHIROPRACTIC, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Todd L. Lebson, D.C.)

722.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

723.    North Shore Family Chiropractic, P.C. ("North Shore Family Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

724.     In connection with the operation and management of the North Shore Family Chiropractic enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., and Todd L. Lebson, D.C. (collectively "Count XI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of North Shore Family Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by North Shore Family Chiropractic would occur, in furtherance of their scheme to defraud.

725.     The Count XI Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

726.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

727.     Policies of insurance were delivered to insureds through the U.S. Mail.

728.     Payments to North Shore Family Chiropractic traveled through the U.S. Mail.

729.     As documented above, the Count XI Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at North Shore Family Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

730.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to North Shore Family Chiropractic for the benefit of the Count XI Defendants that would not otherwise have been paid.

731.    The Count XI Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

732.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

733.    By mailing numerous fraudulent claims in an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

734.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to North Shore Family Chiropractic for the benefit of the Count XI Defendants.

735.    The Count XI Defendants participated in the conduct of the North Shore Family Chiropractic enterprise through a pattern of racketeering activities.

736.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

737.    The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

738.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

739.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

740.    By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATION 18 U.S.C. § 1962(d)**
**NORTH SHORE FAMILY CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.**
**and Todd L. Lebson, D.C.)**

741.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

742.    Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Todd L. Lebson, D.C. (collectively "Count XII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of North Shore Family Chiropractic, P.C. ("North Shore Family Chiropractic").

743.    The Count XII Defendants each agreed to further, facilitate, support, and operate the North Shore Family Chiropractic enterprise.

744.    As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

745.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of North Shore Family Chiropractic even though North Shore Family Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

746.    The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

747.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XII Defendants' unlawful conduct described herein.

748.    By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**WELLNESS EXPRESS PT, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.**
**and Sherwin Yong Tamayo, P.T.)**

749.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

750.    Wellness Express PT, P.C. ("Wellness Express PT") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

751.    In connection with the operation and management of the Wellness Express PT enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., and Sherwin Yong Tamayo, P.T. (collectively "Count XIII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Wellness Express PT's business,

or should have reasonably foreseen that the mailing of such false medical documentation by Wellness Express PT would occur, in furtherance of their scheme to defraud.

752.    The Count XIII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 8.

753.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

754.    Policies of insurance were delivered to insureds through the U.S. Mail.

755.    Payments to Wellness Express PT traveled through the U.S. Mail.

756.    As documented above, the Count XIII Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Wellness Express PT, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

757.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Wellness Express PT for the benefit of the Count XIII Defendants that would not otherwise have been paid.

758.    The Count XIII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

759.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

760.    By mailing numerous fraudulent claims in an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

761.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Wellness Express PT for the benefit of the Count XIII Defendants.

762.    The Count XIII Defendants participated in the conduct of the Wellness Express PT enterprise through a pattern of racketeering activities.

763.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

764.    The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

765.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

766.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

767.    By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**WELLNESS EXPRESS PT, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.**
**and Sherwin Yong Tamayo, P.T.)**

768.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

769.     Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Sherwin Yong Tamayo, P.T. (collectively "Count XIV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Wellness Express PT, P.C. ("Wellness Express PT").

770.     The Count XIV Defendants each agreed to further, facilitate, support, and operate the Wellness Express PT enterprise.

771.     As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

772.     The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Wellness Express PT even though Wellness Express PT was not eligible to collect such benefits by virtue of its unlawful conduct.

773.     The Count XIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

774.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XIV Defendants' unlawful conduct described herein.

775.     By virtue of the Count XIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**UNICORN ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.**
**and Dekun Wang, L.Ac.)**

776.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

777.    Unicorn Acupuncture, P.C. ("Unicorn Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

778.    In connection with the operation and management of the Unicorn Acupuncture enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., and Dekun Wang, L.Ac. (collectively "Count XV Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Unicorn Acupuncture's business, or should have reasonably foreseen that the mailing of such false medical documentation by Unicorn Acupuncture would occur, in furtherance of their scheme to defraud.

779.    The Count XV Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

780.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

781.    Policies of insurance were delivered to insureds through the U.S. Mail.

782.    Payments to Unicorn Acupuncture traveled through the U.S. Mail.

783.    As documented above, the Count XV Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Unicorn Acupuncture, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

784.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Unicorn Acupuncture for the benefit of the Count XV Defendants that would not otherwise have been paid.

785.    The Count XV Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

786.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

787.    By mailing numerous fraudulent claims in an ongoing scheme, the Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

788.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Unicorn Acupuncture for the benefit of the Count XV Defendants.

789.    The Count XV Defendants participated in the conduct of the Unicorn Acupuncture enterprise through a pattern of racketeering activities.

790.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV Defendants' conduct.

791.    The Count XV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

792.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

793.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

794.    By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVI
### VIOLATION 18 U.S.C. § 1962(d)
### UNICORN ACUPUNCTURE, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Dekun Wang, L.Ac.)

795.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

796.    Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Dekun Wang, L.Ac. (collectively "Count XVI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Unicorn Acupuncture, P.C. ("Unicorn Acupuncture").

797.    The Count XVI Defendants each agreed to further, facilitate, support, and operate the Unicorn Acupuncture enterprise.

798.     As such, the Count XVI Defendants conspired to violate 18 U.S.C. § 1962(c).

799.     The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Unicorn Acupuncture even though Unicorn Acupuncture was not eligible to collect such benefits by virtue of its unlawful conduct.

800.     The Count XVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

801.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XVI Defendants' unlawful conduct described herein.

802.     By virtue of the Count XVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ECLIPSE MEDICAL IMAGING, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Jack Baldassare, M.D.)

803.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

804.     Eclipse Medical Imaging, P.C. ("Eclipse Medical Imaging") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

805.     In connection with the operation and management of the Eclipse Medical Imaging enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Jack Baldassare, M.D.  (collectively "Count XVII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Eclipse Medical Imaging's business, or should have reasonably foreseen that the mailing of such false medical documentation by Eclipse Medical Imaging would occur, in furtherance of their scheme to defraud.

806.     The Count XVII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 10.

807.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

808.     Policies of insurance were delivered to insureds through the U.S. Mail.

809.     Payments to Eclipse Medical Imaging traveled through the U.S. Mail.

810.     As documented above, the Count XVII Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Eclipse Medical Imaging, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

811.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Eclipse Medical Imaging for the benefit of the Count XVII Defendants that would not otherwise have been paid.

812.    The Count XVII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

813.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

814.    By mailing numerous fraudulent claims in an ongoing scheme, the Count XVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

815.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Eclipse Medical Imaging for the benefit of the Count XVII Defendants.

816.    The Count XVII Defendants participated in the conduct of the Eclipse Medical Imaging enterprise through a pattern of racketeering activities.

817.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII Defendants' conduct.

818.    The Count XVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

819.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

820.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

821. By virtue of the Count XVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**ECLIPSE MEDICAL IMAGING, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Jack Baldassare, M.D.)**

822. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

823. Defendants Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Jack Baldassare, M.D. (collectively "Count XVIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Eclipse Medical Imaging, P.C. ("Eclipse Medical Imaging").

824. The Count XVIII Defendants each agreed to further, facilitate, support, and operate the Eclipse Medical Imaging enterprise.

825. As such, the Count XVIII Defendants conspired to violate 18 U.S.C. § 1962(c).

826. The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Eclipse Medical Imaging even though Eclipse Medical Imaging was not eligible to collect such benefits by virtue of its unlawful conduct.

827. The Count XVIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

828. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XVIII Defendants' unlawful conduct described herein.

829. By virtue of the Count XVIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## CARDENAL MANAGEMENT CORP. ENTERPRISE
**(Against Albert Vaynshteyn, Yelena Maksumov, Robert Maks, Sayeedus Salehin, M.D., Todd L. Lebson, D.C., Zhi-Yuan Zhong, L.Ac., Carmen Maria Donna Jose-Dizon, P.T., Sherwin Yong Tamayo, P.T., Dekun Wang, L.Ac., Jack Baldassare, M.D., Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C. and Eclipse Medical Imaging, P.C.)**

830. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

831. In connection with each of the claims identified in plaintiffs' Complaint, Albert Vaynshteyn, Yelena Maksumov, Robert Maks, Sayeedus Salehin, M.D., Todd L. Lebson, D.C., Zhi-Yuan Zhong, L.Ac., Carmen Maria Donna Jose-Dizon, P.T., Sherwin Yong Tamayo, P.T., Dekun Wang, L.Ac., Jack Baldassare, M.D., Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging (collectively, "Count XIX Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

832.   The Count XIX Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts at Exhibits 2-10.

833.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

834.   Policies of insurance were delivered to insureds through the U.S. Mail.

835.   Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

836.   As documented above, the Count XIX Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C.  to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

837.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C., for the benefit of the Count XIX Defendants, that would not otherwise have been paid.

838.    The Count XIX Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

839.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

840.    By filing numerous fraudulent claims in an ongoing scheme, the Count XIX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

841.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C., for the benefit of the Count XIX Defendants.

842.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

843.    Cardenal Management Corp. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

844.    The Count XIX Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

845.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIX Defendants' conduct.

846.     The Count XIX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

847.     By virtue of the Count XIX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XX
### VIOLATION 18 U.S.C. § 1962(d)
### CARDENAL MANAGEMENT CORP. ENTERPRISE
**(Against Albert Vaynshteyn, Yelena Maksumov, Robert Maks, Sayeedus Salehin, M.D., Todd L. Lebson, D.C., Zhi-Yuan Zhong, L.Ac., Carmen Maria Donna Jose-Dizon, P.T., D.C., Sherwin Yong Tamayo, P.T., Dekun Wang, L.Ac., Jack Baldassare, M.D., Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C.)**

848.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

849.     Albert Vaynshteyn, Yelena Maksumov, Robert Maks, Sayeedus Salehin, M.D., Todd L. Lebson, D.C., Zhi-Yuan Zhong, L.Ac., Carmen Maria Donna Jose-Dizon, P.T., Sherwin Yong Tamayo, P.T., Dekun Wang, L.Ac., Jack Baldassare, M.D., Avenue C Medical, Harmony Chiropractic, Vista Acupuncture, Total Mobility PT, Brooklyn Medical, North Shore Family Chiropractic, Wellness Express PT, Unicorn Acupuncture, and Eclipse Medical Imaging (collectively, "Count XX Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Cardenal Management Corp. ("Cardenal Management").

850.     The Count XX Defendants each agreed to further, facilitate, support, and operate the Cardenal Management enterprise.

851.     As such, the Count XX Defendants conspired to violate 18 U.S.C. § 1962(c).

852.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C. even though Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C. were not eligible to collect such benefits by virtue of their unlawful conduct.

853.    The purpose of this conspiracy was also to unlawfully channel to Vaynshteyn and Maksumov, through Cardenal Management Corp., the professional fees and profits of Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C.

854.    The Count XX Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

855.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XX Defendants' unlawful conduct described herein.

856.    By virtue of the Count XX Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXI**
**COMMON-LAW FRAUD**
**(Against All Defendants)**

857.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

858.    The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect No-Fault benefits under New York law.

859.    The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices and collection documentation.

860.    The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

861.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from fraudulently incorporated medical clinics for No-Fault insurance benefits and bodily injury claims.

862.    The defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not legitimate.

863.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous, unreasonable, unnecessary, inappropriate, non-meritorious bills for medical expenses pursuant to No-Fault insurance claims, bodily injury claims, and uninsured/underinsured motorist claims.

864.    Allstate's damages include, but are not limited to:

        a.    All No-Fault benefits paid to the fraudulently-incorporated PC Defendants and their associates (*see* Exhibits 11-19); and

      b.    Reimbursement for the fair and reasonable value of the labor and resources expended to detect and expose the defendants' scheme to defraud Allstate.

### COUNT XXII
### UNJUST ENRICHMENT
### (Against All Defendants)

865.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

866.    When Allstate paid Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C. ("PC Defendants"), it reasonably believed that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

867.    Allstate's payments constitute a benefit which the defendants aggressively sought and voluntarily accepted.

868.    The defendants caused the PC Defendants to wrongfully obtain payments from the plaintiff through their fraudulent billing scheme as described more fully in the paragraphs above.

869.    Retention of those benefits would violate fundamental principles of justice, equity and good conscience.

### COUNT XXIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C.)

870.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-586 as if set forth fully herein.

871.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes which grant the authority to provide health services in New York.

872.    In view of their illegal corporate structure, and/or illegal control by one or more individuals not licensed to provide medical services, the PC Defendants have been operating in violation of New York's Business Corporation Laws, New York's Limited Liability Company Laws, New York's Insurance Laws (and other statutory provisions); therefore, the PC Defendants have no standing to submit, or receive payment for, assigned No-Fault benefits.

873.    The PC Defendants (i.e., Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C.) continue to submit assigned No-Fault claims to Allstate, and other claims remain pending with Allstate.

874.    The PC Defendants continue to challenge prior claim denials.

875.    The PC Defendants continue to commence litigation against Allstate in connection seeking payment of No-Fault benefits allegedly due and owing.

876.    A justifiable controversy exists between Allstate and the PC Defendants since the PC Defendants challenge Allstate's ability to deny such claims.

877.    Allstate has no adequate remedy at law.

878.    The PC Defendants will continue to bill Allstate for No-Fault services absent a declaration by this Court that their activities are unlawful, and that Allstate has no obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by any of the PC Defendants.

879.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants were fraudulently incorporated and/or controlled by non-licensed laypersons in violation of New York's Business Corporation Laws, New York's Limited Liability Company Laws, New York's Insurance Laws, (and other statutory provisions), and thus have no standing to submit or receive assigned No-Fault benefits.

## X.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

### COUNT I

**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**AVENUE C MEDICAL, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Sayeedus Salehin, M.D.)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT II
**VIOLATION 18 U.S.C. § 1962(d)**
**AVENUE C MEDICAL, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Sayeedus Salehin, M.D.)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### HARMONY CHIROPRACTIC, P.C. ENTERPRISE
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Todd L. Lebson, D.C.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION 18 U.S.C. § 1962(d)
### HARMONY CHIROPRACTIC, P.C. ENTERPRISE
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Todd L. Lebson, D.C.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### VISTA ACUPUNCTURE, P.C. ENTERPRISE
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Zhi-Yuan Zhong, L.Ac.)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI

### VIOLATION 18 U.S.C. § 1962(d)
### VISTA ACUPUNCTURE, P.C. ENTERPRISE
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Zhi-Yuan Zhong, L.Ac.)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### TOTAL MOBILITY PT, P.C. ENTERPRISE
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Carmen Maria Donna Jose-Dizon, P.T.)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT VIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**TOTAL MOBILITY PT, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Carmen Maria Donna Jose-Dizon, P.T.)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BROOKLYN MEDICAL PRACTICE, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.**
**and Sayeedus Salehin, M.D.)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT X
### VIOLATION 18 U.S.C. § 1962(d)
### BROOKLYN MEDICAL PRACTICE, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Sayeedus Salehin, M.D.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NORTH SHORE FAMILY CHIROPRACTIC, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Todd L. Lebson, D.C.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT XII
### VIOLATION 18 U.S.C. § 1962(d)
### NORTH SHORE FAMILY CHIROPRACTIC, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Todd L. Lebson, D.C.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct

alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### WELLNESS EXPRESS PT, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.
### and Sherwin Yong Tamayo, P.T.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and

attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct

alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION 18 U.S.C. § 1962(d)
### WELLNESS EXPRESS PT, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.
### and Sherwin Yong Tamayo, P.T.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and

attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct

alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### UNICORN ACUPUNCTURE, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Dekun Wang, L.Ac.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION 18 U.S.C. § 1962(d)
### UNICORN ACUPUNCTURE, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp. and Dekun Wang, L.Ac.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XVII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ECLIPSE MEDICAL IMAGING, P.C. ENTERPRISE
### (Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp., Robert Maks, and Jack Baldassare, M.D.)

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XVIII**
**VIOLATION 18 U.S.C. § 1962(d)**
**ECLIPSE MEDICAL IMAGING, P.C. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Cardenal Management Corp.,**
**Robert Maks, and Jack Baldassare, M.D.)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XIX**

**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**CARDENAL MANAGEMENT CORP. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Robert Maks, Sayeedus Salehin, M.D.,**
**Todd L. Lebson, D.C., Zhi-Yuan Zhong, L.Ac., Carmen Maria Donna Jose-Dizon, P.T.,**
**Sherwin Yong Tamayo, P.T., Dekun Wang, L.Ac., Jack Baldassare, M.D., Avenue C**
**Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT,**
**P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness**
**Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C.)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XX**
**VIOLATION 18 U.S.C. § 1962(d)**
**CARDENAL MANAGEMENT CORP. ENTERPRISE**
**(Against Albert Vaynshteyn, Yelena Maksumov, Robert Maks, Sayeedus Salehin, M.D.,**
**Todd L. Lebson, D.C., Zhi-Yuan Zhong, L.Ac., Carmen Maria Donna Jose-Dizon, P.T.,**
**Sherwin Yong Tamayo, P.T., Dekun Wang, L.Ac., Jack Baldassare, M.D., Avenue C**
**Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C., Total Mobility PT,**
**P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic, P.C., Wellness**
**Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse Medical Imaging, P.C.)**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct

alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XXI**
**COMMON-LAW FRAUD**
**(Against All Defendants)**

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the

detection of defendants' illegal conduct;

(c)     AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment

of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just.

**COUNT XXII**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

(a)     AWARD Allstate's actual and consequential damages to be determined at trial;

(b)     GRANT any other relief this Court deems just.

**COUNT XXIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture, P.C.,**
**Total Mobility, P.C., Brooklyn Medical Practice, P.C., North Shore Family Chiropractic,**
**P.C.,  Wellness Express PT, P.C., Unicorn Acupuncture, P.C.,**
**and Eclipse Medical Imaging, P.C.)**

(a)      DECLARE that Avenue C Medical, P.C., Harmony Chiropractic, P.C., Vista Acupuncture,

P.C., Total Mobility, P.C., Brooklyn Medical Practice, P.C., North Shore Family

Chiropractic, P.C., Wellness Express PT, P.C., Unicorn Acupuncture, P.C., and Eclipse

Medical Imaging, P.C. (collectively "PC Defendants"), are operating in violation of New

York Business Corporation Laws, New York Limited Liability Company Laws, New York

Public Health Laws, New York Insurance Laws, and , and other statutory provisions;

(b)      DECLARE that the PC Defendants' activities are unlawful;

(c)      DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future

No-Fault insurance claims submitted by the PC Defendants; and

(d)      GRANT all other relief this Court deems just and appropriate.

**JURY TRIAL DEMAND**

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.


*/s/ Shauna L. Sullivan*
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Shauna L. Sullivan (SS5624)
ssullivan@smithbrink.com
Hugh C. M. Brady (pro hac vice)
hbrady@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
(347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company, and*
*Allstate Fire and Casualty Insurance Company*


Dated: January 26, 2021